FARMERS & MERCHANTS BANK, Plaintiff and Counterdefendant-Appellee, v. LAVERNE DAVIS et al., Defendants and Counterplaintiffs-Appellants (Economy Fire & Casualty Company, Defendant and Counterdefendant-Appellee; Dean Lyman, d/b/a Dean Lyman Agency, Third-Party Defendant).

Second District No. 2—85—0949

Opinion filed January 13, 1987.

Scott R. Erwin, of De Kalb, for appellants.

James R. Buck, of Klein, Stoddard & Buck, of Sycamore, for appellee Farmers & Merchants Bank.

Louis W. Brydges, Jr., of Brydges, Riseborough, Morris, Franke & Miller, of Waukegan, for appellee Economy Fire & Casualty Company.

JUSTICE HOPF delivered the opinion of the court:

This appeal arises from an attempt by plaintiff, Farmers & Merchants Bank, to recover on a check cashed in the bank by defendants, the Davises, after payment had been stopped on the check. Payment had been stopped because the issuer, Economy Fire & Casualty Company, had previously received an NSF check from the Davises in payment of an insurance premium. Economy Fire & Casualty Company had also canceled the Davises' insurance policy. The Davises (counterplaintiffs) raise three issues on appeal: (1) whether the insurance company waived its right to declare a forfeiture of their insurance coverage; (2) whether the bank was estopped from disclaiming liability for nonpayment of the insurance premium; and (3) whether the third-party defendant, a local agency of the insurer, was properly granted a directed verdict.

LaVerne and Alice Davis (the Davises) purchased auto insurance

from Economy Fire & Casualty Company (Economy) through the Dean Lyman Insurance Agency (Lyman). On September 7, 1982, Economy mailed a premium notice to the Davises indicating that the insurance premium on the Davises' autos was due on or before October 17, 1982. The Davises did not make the payment by October 17. Three days later Economy sent the Davises a notice that the payment was overdue but would not lapse if payment was received by November 4, 1982. On November 4 the Davises phoned Lyman and asked how to reinstate the policy. The Davises then sent a check, drawn on Farmers & Merchants Bank (F & M) and dated November 4, 1982, in payment of the premium. The check was received by Economy on November 10, 1982. The next day, November 11, 1982, the Davises' car was vandalized. The vandalism was reported to the Lyman Insurance Agency.

On November 29, 1982, Economy sent to the Davises an endorsement advising that the policy had been reinstated, effective November 10, 1982, and that all the terms and conditions of the old policy were in effect. The old policy contained language indicating that acceptance of a check in payment of a premium was conditional on the check being honored by the payors' bank. The Davises received payment from Economy for damages resulting from the November 11 vandalism on December 1, 1982.

It is not clear when Economy deposited the Davises' premium payment check, which they had received on November 10, but it was not processed at the Federal Reserve Bank until December 1. It was received by F & M on December 1 or 2.

Although there had been enough money in the Davises' checking account to cover the check at the time it was written, by the time the check got to F & M those funds were no longer sufficient. Another check, which was supposed to have been held until December 1, was processed on November 30, thus depleting the account. F & M dishonored the premium payment check and returned it to Economy marked NSF. Also, on December 1, LaVerne Davis was involved in an automobile accident. His damaged car was towed to a body shop owned by Billy Marbutt.

On December 10, 1982, before it learned of F & M's dishonor of the Davises' check, Economy gave Billy Marbutt a check for $2,577.35 in payment for the repairs to the Davises' auto.

Economy received notice that the Davises' check had not been honored by F & M on December 16, 1982. On December 17 Economy notified the Davises by phone of the dishonor and also sent them a notice of cancellation of the insurance policy retroactive to November

10, 1982. A letter explaining the cancellation was sent to the Davises by Economy on December 22, 1982.

On January 21, 1983, LaVerne Davis picked up the check Economy had given to Billy Marbutt, cashed it at F & M, and paid for the repairs. The check was subsequently returned to F & M unpaid. Economy had stopped payment on it when it learned that the Davises' premium payment check had been dishonored.

F & M had, on previous occasions, transferred funds between accounts to cover NSF checks written by the Davises, even though there was no agreement between F & M and the Davises regarding such transfers. F & M, pursuant to an informal policy, had voluntarily made the transfers between accounts that had the same base number (a number used to group a customer's accounts). Making the transfers between such accounts was an easy matter for the bank because overdraft notices had printed on their faces the customer's other accounts having the same base number as the overdrawn account, as well as the amounts in those other accounts. The bank officer needed only to examine the overdraft notice to determine whether the customer had sufficient funds in another account to cover the overdraft. However, when the customer had accounts with different base numbers, an overdraft notice in one account would not even reveal the existence of another account with a different base number. Transfers between such funds would be made only if the bank officer who examined the overdraft notice had personal knowledge of another account or if the customer specifically requested such a transfer.

While the Davises had a savings account with the same base number as their checking account, there were not enough funds in the savings account to cover the premium payment check sent to Economy. Since the overdraft notice did not indicate the existence of any other Davis accounts, the check was returned NSF. However, the Davises did maintain with F & M a designated minor's account for their daughter, Noel, which contained enough money to cover the check. LaVerne and Alice were signatories on that account. None of the transfers previously made by F & M between the Davises' accounts had been made from the minor's account to the parents' account. Donald Robinson, cashier at F & M at the time, testified that the bank considered it unethical to transfer from a child's account to a parent's account to accommodate a parent's check-writing habits.

After the Davises received the notice of cancellation from Economy, LaVerne Davis asked Donald Robinson to write a letter to Economy explaining that, if he, Robinson, had known that the Davises had another account, he would have transferred funds to the Davises'

checking account in order to avoid dishonoring their check. Although Robinson wrote the letter as requested, he testified that he had not known at the time that the other account was a minor's account.

F & M sued the Davises and Economy to recover the money paid to LaVerne Davis when he cashed the check Economy had given to Billy Marbutt. The Davises counterclaimed against F & M alleging that the bank had wrongfully dishonored their premium payment check. The Davises also cross-claimed for a declaratory judgment against Economy and Dean Lyman Agency (Economy's local insurance agency) that their auto insurance policy was in full force and effect at the time of the December 1 accident.

At trial, by agreement, each party presented only its own witnesses and not other parties or other parties' witnesses, during its own particular case. After F & M and the Davises presented their cases, Lyman moved for and was granted a directed verdict. At the end of the trial, the court entered judgment for F & M against the Davises and Economy, denied the Davises' counterclaim against F & M for wrongful dishonor, and denied the Davises' complaint for declaratory judgment against Economy. The Davises then filed this appeal.

The Davises first assert that the trial court erred in failing to declare that the auto insurance policy they had with Economy was in effect on December 1, 1982, the day of LaVerne Davis' accident. They argue that Economy either accepted their check in payment of the insurance premium without indicating that acceptance was conditional upon the check being honored, or, alternatively, that Economy, by its actions, waived the right to declare a forfeiture of coverage because of nonpayment of the premium. We think the Davises' waiver argument has merit.

■ The general rule in Illinois regarding payment by check is contained in the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 2—511(3)): "[P]ayment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment." In regard to insurance contracts, the rule may be altered by the express or implied intent of the parties that acceptance of a check is absolute rather than conditional. (*Cullotta v. Kemper Corp.* (1979), 78 Ill. 2d 25, 29, 397 N.E.2d 1372.) When an insurer accepts a premium payment check absolutely, the insurance contract is immediately formed, and the insurer cannot later deny coverage even if the check is dishonored. (*Abbey v. Lumbermen's Mutual Casualty Co.* (1980), 83 Ill. App. 3d 995, 997-98, 404 N.E.2d 991.) Whether acceptance of a check by an insurer is absolute or conditional is a question of the facts

and circumstances of the transaction and is to be determined by the trier of fact. *Cullotta v. Kemper Corp.* (1979), 78 Ill. 2d 25, 30, 397 N.E.2d 1372.

The insurer in *Cullotta*, like Economy in this case, had declared a forfeiture of coverage because the insured's premium payment check was returned NSF. The appellate court had affirmed a grant of summary judgment for the insurer on the basis that no facts had been presented to suggest that the insured's check was accepted unconditionally. The supreme court, however, found a number of facts, as established by the pleadings and affidavits, which sufficiently raised the question of whether acceptance had been absolute or conditional to require that the matter go to the trier of fact for resolution.

The *Cullotta* court first found that delivery of a receipt, in the form of a renewal policy without conditional language, which showed payment upon acceptance of a check, raised a rebuttable presumption that the check was taken in absolute payment of the premium. The court added as facts to be considered in deciding the question: (1) the insurer, upon receipt of the insured's check, made a notation to reinstate on its in-house copy of the cancellation notice; (2) the insured had sufficient funds in his account to cover the check both when it was drawn, and up until a week afterward; (3) there was a 12- or 14-day delay between the time the insurer received the NSF check and the time the check was returned to the insured; and (4) upon notice of the dishonor, the insured immediately sent to the insurer a cashier's check in the same amount as the dishonored check to show his good faith.

The court had also earlier noted a number of factors which courts in other jurisdictions found to be indicative of absolute acceptance. Among them were: issuance of a policy document, absence of conditional language within the policy, and treatment and processing of the check as though a cash premium had been paid (*Bartleman v. Humphrey* (Mo. 1969), 441 S.W. 2d 335, 344); acceptance of a personal check and issuance of an official receipt (*Martin v. New York Life Insurance Co.* (1925), 30 N.M. 400, 234 P. 673); premium notice marked "paid," and insured's good faith was shown by the facts that there were sufficient funds in his account when the check was drawn and that he forwarded payment upon notice of dishonor (*National Life Co. v. Brennecke* (1938), 195 Ark. 1088, 115 S.W.2d 855); absence of conditional language on check receipt (*Thorson v. Wisconsin Life Insurance Co.* (1938), 227 Wis. 254, 278 N.W. 416). See also *Abbey v. Lumbermen's Mutual Casualty Co.* (1980), 83 Ill. App. 3d 995, 404 N.E.2d 991.

In the case before us, the notice of reinstatement sent by Economy to the Davises on November 29, 1982, contained the following language: "It is agreed that such insurance as is afforded by this policy is reinstated in accordance with the terms and conditions of the policy on the effective date indicated above. All other conditions, stipulations, representations and limitations stated in the policy not in conflict herewith remain the same." According to paragraph D5 of part VI of the policy which was reinstated:

> "A check given in payment of any premium required for effective payment of this policy which was not honored by the payor's Bank upon presentation for payment, shall be construed under the provisions of this policy as non-payment of premium and no coverage is afforded for any time period or term of this policy for which such check was written."

■ While conditional language is contained in Economy's policy, under the guidelines of *Cullotta,* Economy's actions indicate that it had accepted the Davises' check absolutely and unconditionally. Economy received the check on November 10. Although the date Economy deposited the check was not established, it was received at the Federal Reserve Bank on December 1 and at F & M by December 2. The trial court said regarding this timespan: "[T]he insurance company *** apparently held the Davis check dated November 4, 1982, for premium payment so that the bank did not receive the check until December 2, 1982." Since the Davises' checking account had sufficient funds to cover the check not only when they wrote it, but also right up until December 1, the delay in depositing the check could have meant the difference between its being honored or dishonored when it reached F & M.

Also, Economy sent the Davises a notice that the policy had been reinstated. Although the notice referred to the "terms and conditions" of the policy, it was not accompanied by a copy of the policy itself. Thus, the notice did not indicate on its face that the Davises' check had been accepted only upon the condition that it would eventually be honored and paid. At best, the meaning of the reference to "conditions" could be discovered by the Davises only after locating and examining their old policy. The reinstatement notice provided scant indication that Economy intended to accept the check only conditionally.

Furthermore, on two separate occasions between the time it received the check and the time it was dishonored, Economy paid insurance proceeds to the Davises: once for vandalism damage which occurred on November 11, 1982, the day after reinstatement, and again

for payment of repair costs incurred in the December 1 accident. It is difficult to comprehend Economy's position that it accepted the Davises' check conditionally when, while it was supposedly waiting for the check to be honored, it covered the Davises' losses.

Finally, there was sufficient money in the Davises' checking account to cover the check when they wrote it. It also appears that another check was cashed prematurely, thus depleting the account prior to the time the Davises would have expected to have to replenish it. Moreover, according to Alice Davis' testimony, they had been told that if the dishonor was bank error, a letter to that effect from the bank would clear up the matter. The Davises subsequently secured an explanatory letter from Donald Robinson. These are strong indicators of the Davises' good faith regarding the insurance premium.

In light of all these facts and circumstances, we find that Economy waived its right to declare the insurance policy lapsed for nonpayment of the premium.

Waiver, which may be expressed or implied, may be found where the words or conduct of an insurer are inconsistent with an intent to rely on the requirements of the policy. (*Ames v. Crown Life Insurance Co.* (1980), 85 Ill. App. 3d 203, 406 N.E.2d 222.) Economy's conduct, and in particular their treatment of the Davises as paid-up insureds entitled to insurance proceeds, was inconsistent with a conditional acceptance of the Davises' check. The conditional language in the original policy, which was only vaguely referred to in the reinstatement notice, was overshadowed by that inconsistency and will not prevent a finding of waiver.

■ We are persuaded that application of a rule of waiver is appropriate here. It is well recognized that automobile insurance plays a vital role in modern society by affording financial protection to persons who have been injured in auto collisions and by allowing them to remain independent. That is why " '[f]orfeiture of an insurance contract for nonpayment of premium is not favored in the law, and courts are prompt to seize upon circumstances which indicate a waiver of forfeiture.' " (*Van Hulle v. State Farm Mutual Automobile Insurance Co.* (1969), 44 Ill. 2d 227, 232, cited in *Cullotta v. Kemper Corp.* (1979), 78 Ill. 2d 25, 33, 397 N.E.2d 1372.) The circumstances of this case indicate such a waiver.

■ The Davises next assert that the trial court erred in denying their counterclaim against F & M for wrongful dishonor of the check they sent to Economy in payment of the insurance premium. Plaintiffs argue that the bank is estopped from asserting a defense to their wrongful dishonor claim because the bank's conduct in covering pre-

vious NSF checks led them to rely on such coverage and ultimately to be damaged by that reliance. We find little merit in plaintiffs' argument.

The doctrine of estoppel is applicable when one party changes his position in reliance on the word or conduct of another and subsequently suffers harm. (*Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 95-96, 473 N.E.2d 548.) Estoppel will be effective against a party who, by his conduct, intentionally or negligently induces another to rely upon that conduct and, as a result, to act in such a way that he is ultimately injured. (*Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 445 N.E.2d 901.) Although it is not necessary to show an intent to mislead, the reliance must be reasonable. (*Shockley v. Ryder Truck Rental, Inc.* (1979), 74 Ill. App. 3d 89, 95, 392 N.E.2d 675.) Estoppel must be shown by clear, unambiguous evidence. (*Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 96, 473 N.E.2d 548.) In the case before us, plaintiffs have not met the requirements for application of estoppel.

The Davises insist that F & M, in accord with its usual practice, should have transferred money from their daughter's savings account to their own checking account. They have failed to show, however, that such transfers were part of the bank's usual practice. The bank presented evidence that it did not make transfers from a minor's account to a parent's account, at least not without a specific request, and that it would consider such a unilateral transfer by them to be unethical. This testimony was not refuted. Plaintiffs produced no evidence of such a transfer in the past, between either any of their own accounts or anyone else's accounts. The Davises do not contend that they asked the bank to make such a transfer. Thus, plaintiffs have not clearly shown that the specific action they insist the bank should have taken was part of the course of conduct on which they base their estoppel argument.

In addition, the Davises' daughter's account had a base number different from their own checking account. There was unrefuted testimony that the only time the bank made transfers between accounts with different base numbers was when the bank officer handling an NSF check had personal knowledge of another account in the customer's name, or upon customer request. In the case of the Davises, only 1 out of 12 previous transfers had been between accounts with different base numbers. This is not sufficient evidence to support a finding that the bank so routinely made such transfers that its customers were entitled to rely on that routine and to apply estoppel against the bank if it failed to do so.

Furthermore, the evidence shows that when the Davises wrote the check to Economy there was enough in their checking account to cover it. A later check, which was supposed to be held until December 1, went through before that date and resulted in the subsequent overdraft. It appears clear the Davises were keeping track of the balance in their checking account and making every effort to assure that the checks they wrote were sufficiently covered in order to avoid overdrafts. Such conduct is inconsistent with the Davises' insistence now that they relied on the bank's NSF policies and were lulled into believing the insurance check would be covered even if there was not enough money in the account.

Finally, we do not think estoppel should be available to protect a party from the consequences of his own fiscal mismanagement. In the absence of an argument such as estoppel, there is nothing to obligate a bank to cover NSF checks. F & M did it here only as a courtesy, and then only when the customer had other funds in the bank and within guidelines which kept the process simple for the bank. There was nothing in the practice to indicate that F & M was setting itself up as a watchdog over its customers' checking account balances. Plaintiffs' attempt to put F & M in such a position is an attempt to escape responsibility for their own oversight.

■ The last claim made by the Davises is that the trial court erred in granting the Dean Lyman Agency's motion for a directed verdict before Lyman had presented its witnesses. We agree with plaintiffs.

In their complaint, the Davises sought a declaratory judgment against Economy, and Lyman as an agent of Economy, that the auto insurance policy issued to them by Economy was in full force and effect on December 1, 1982, the day of LaVerne Davis' collision. They also sought a judgment against Economy and Lyman for expenses incurred when they had to provide their own defense to claims made against them as a result of the December 1 accident. Both of these issues were disposed of by the trial court, as to Lyman, part way through the trial.

The trial of this case proceeded in an unorthodox manner. Normally, each party would present its own case in its entirety and then rest. This means that each party would call its own witnesses, as well as all adverse witnesses, during the presentation of its case. Here, however, because of the number of parties and the difficulty in setting the order of witnesses, the parties agreed that each of them would present only its own witnesses, who could then be cross-examined in lieu of testifying as adverse witnesses for the other parties. This pro-

cedure avoided the problem of calling and recalling the same witnesses over and over again.

The trial proceeded according to the agreement until F & M and the Davises had presented their own witnesses and cross-examined each other's witnesses. Lyman and Economy also cross-examined the witnesses. Lyman then made a motion for a directed verdict which the trial court granted. This meant that Lyman presented no case at all. No witnesses testified for Lyman, nor were any of Lyman's witnesses cross-examined. On these facts we conclude that the trial court erroneously granted Lyman's motion for a directed verdict.

The Code of Civil Procedure provides that: "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor." (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110.) The rule clearly contemplates that the plaintiff will have presented its entire case before a motion for directed verdict may be entertained by the trial court. In the instant case, we do not think the plaintiffs had completed their case.

Even though counsel for the Davises indicated that he was resting his case, he had no opportunity to question Lyman's witnesses, either as adverse witnesses or through cross-examination. His indication that he was resting had to mean that he had called all his own witnesses and was ready to proceed according to the agreement, whereby Economy and Lyman would present their witnesses, who could then be cross-examined. Only in that way could it be said that the Davises truly had an opportunity to complete their case before the trial court.

Alice Davis testified that the Lyman employee she spoke with was Josie Panula. The trial transcript reveals that counsel for Lyman had brought Josie Panula back to Illinois from Louisiana for the trial. It is highly likely that, except for the pretrial agreement, counsel for the Davises would have called Josie Panula in its case against Lyman. However, since adverse witnesses were not being utilized, plaintiffs had to rely on cross-examination of Panula in order to secure her testimony. The granting of the motion for directed verdict made it unnecessary for Lyman to call Panula, or any other witnesses. Thus, the Davises were precluded from offering the evidence they would otherwise have elicited on cross-examination. Since plaintiffs' case had not been completed, the defendant's motion for directed verdict was granted prematurely.

We have already determined that the trial court finding in favor of Economy in the Davises' declaratory judgment action must be reversed. This finding will control the declaratory judgment action against Lyman. However, Lyman's liability, if any, for the expenses

the Davises incurred in defending themselves against the December 1 accident claims must yet be determined. Accordingly, the trial court error in granting Lyman's motion for directed verdict cannot be characterized as harmless. The plaintiffs must be allowed to complete their case against Lyman.

The judgment of the circuit court of De Kalb County denying defendant Davises' counterclaim for wrongful dishonor is affirmed. The denial of defendant Davises' cross-claim for declaratory judgment against defendant Economy Fire & Casualty Company is reversed. The grant of Dean Lyman Agency's motion for directed verdict also is reversed. The cause is remanded for proceedings to determine the issues of liability and damages, if any, in defendant Davises' claim against third-party defendant Lyman, and to determine the amount of damages for which defendant Economy is liable to defendant Davises.

Affirmed in part; reversed in part and remanded.

LINDBERG, P.J., and NASH, J., concur.