521 So.2d 558 (1988)
Rives McCORD
v.
TIME INSURANCE COMPANY.
No. 87 CA 0019.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
*559 William G. Yates, Houma, for plaintiff and appellee, Rives McCord.
Fred Trowbridge, Thibodaux, for defendant and appellant, Time Ins. Co.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
SAVOIE, Judge.
Plaintiff, Rives McCord, filed suit against Time Insurance Company (hereinafter Insurer) seeking to recover benefits under a major medical insurance policy issued by Insurer, as well as to recover penalties and attorney's fees. McCord sought benefits for the hospitalization of his then sixteen year old son, Robert McCord, at the Baton Rouge Adolescent Chemical Dependency Unit (ACDU) from December 6, 1983 through January 2, 1984.
After trial on the merits, the trial court ruled in favor of Rives McCord, awarding him $10,738.68 for medical benefits and penalties, and $2500.00 in attorney's fees. From this ruling, Insurer appeals.
Insurer urges three assignments of error, which can be summed up as follows: 1) the trial court erred in finding that Robert's treatment for drug and alcohol abuse was covered under the policy on the basis that the drug and alcohol abuse did not manifest itself prior to the policy's effective date; and 2) the trial court erred in awarding Rives McCord penalties and attorney's fees.

COVERAGE UNDER THE POLICY
Under the policy definition of "sickness," Insurer claims that Robert had symptoms of alcohol and drug abuse prior to the effective date of the insurance policy, September 30, 1983. "Sickness" is defined under Insurer's policy as follows:
... Sickness as used in this policy means sickness which first manifests itself more than fifteen days after this policy is in force. A sickness manifests itself if you receive medical treatment or consultation for it or have symptoms of it. (Emphasis ours)
*560 The insurer bears the burden of proving that the sickness is excluded from coverage. Dorsey v. Board of Trustees, State Employees Group Benefits Program, 482 So.2d 735 (La.App. 1st Cir.1985), writs denied, 486 So.2d 735, 736 (La.1986). The insurer must establish that the sickness predated the coverage by a preponderance of the evidence. Dear v. Blue Cross of Louisiana, 511 So.2d 73 (La.App. 3rd Cir.1987). The evidence must be "certain and decisive, leaving no room for speculation or assumption." Dorsey, 482 So.2d at 737.
The trial court found that Insurer did not meet this burden, stating that Insurer showed a history of drug and alcohol use as distinguished from abuse: "However, the mere use of drugs and alcohol does not necessarily constitute a chemical dependency requiring treatment. The burden the defendant must meet is a showing that Robert McCord had symptoms of a chemical dependency and not merely symptoms of drug and alcohol usage."
Insurer mainly relies on the testimony of Dr. Ellis DeVille, a medical and chemical dependency expert. Dr. DeVille diagnosed Robert as suffering from alcohol and chemical abuse, which he defined as "problems in social or occupational functioning" due to alcohol or drugs. He opined that symptoms of this abuse would have been present in Robert some years before his admittance for treatment at ACDU in December, 1983. He based this opinion entirely on Robert's statement when giving his medical history that he had been abusing drugs and alcohol for six yearssince he was ten.
Dr. DeVille testified that he only based his initial diagnosis upon the history Robert gave because there were no objective, physical signs of drug and alcohol abuse. Robert's physical examination "was remarkable only for its normalcy." Furthermore, the blood test and urinalysis test given to Robert were both negative for the presence of drugs or alcohol. Dr. DeVille said that adolescent abusers generally exhibit no visible signs of abuse other than intoxication. Some of the signs of intoxication are red eyes and a flushed face. Dr. DeVille described the physical signs of the use of other drugs: profuse sweating, dilated pupils, and rapid speech for stimulants; and slurred speech, slowed movements, drowsiness, and lethargy for depressants. Again, he saw none of these symptoms on examination of Robert. Further symptoms given by Dr. DeVille were hallucinations and blackouts.
Robert did inform Dr. DeVille that he had experienced blackouts; that he drank to the point of intoxication when he drank; and that he had experienced red eyes due to drinking or drugs. Robert also told Dr. DeVille that his problems "had gotten worse recently, prior to admission." When asked by plaintiff's counsel what Robert may have meant by recently, Dr. DeVille said, "[m]y understanding is it was in the weeks or months prior to presentation [admission into ACDU]...." We note that this was the only specific reference to chronology of the symptoms which took place during the examination of Robert by Dr. DeVille. Further, Dr. DeVille also said that Robert gave no time or date as to his experience with blackouts.
Dr. DeVille also testified as to the psychological signs of drug and alcohol abuse:
[o]ppositional type behavior, anger, outbursts of rage, defiance of rules and authority to the extreme. There would be impulsiveness and erraticness in the behavior. There would probably be significant problems at school, both in conduct and academic performance, and there would certainly be problems at home as a result of all this."
According to Dr. DeVille, based on statements made by Robert, Robert had all of these problems except those with school. However, Dr. DeVille also stated that these behavior problems might have been there without the drugs, and that many adolescents who are not abusing chemicals also have the same behavior problems.
Dr. DeVille concluded his testimony by telling the court that during Robert's twenty-seven day stay at ACDU, his initial diagnosis that Robert was abusing drugs and alcohol was confirmed. Dr. DeVille said: *561 "his entire life style was consumed with drug use and the culture that revolves around drug use."
The medical records from Robert's treatment at ACDU contain a nurse's notes which show that Robert indicated to her that he drank for the past six years with heavy drinking occurring in 1983; that he had blacked out; that he used a quarter-ounce of pot per week; that he used twenty milligrams of Valium each day of the weekend and had used the Valium since the summer; that he experimented with paper acid, cocaine, speed, and downers. This history coincides with the history given Dr. DeVille.
Rives McCord testified on his own behalf, along with his wife Linda. Both McCords stated that they never had observed their son intoxicated and that they had no reason to believe that he had been abusing drugs. Both parents did state that they had seen Robert with red eyes, which Robert told them were due to allergies. However, both parents also stated that Robert had been experiencing allergic reactions since he was a toddler. Both parents said that they had never found drugs or alcohol in Robert's room, or seen him use alcohol or drugs. They said that he had experienced hallucinations once at age ten, for which they took him to a psychiatrist. According to Linda McCord, the psychiatrist said Robert was fine, but prescribed Ritalin for his hyperactivity.
Based on the McCords' testimony, it appears that Robert was a problem child from his childhood into his adolescence. He was disobedient; he lied; he pushed his mother around; he broke his curfew; he took money and checks from his parents; and he did not keep the same friends. The parents found out about their son's drug abuse during the week before Thanksgiving, 1983. Linda McCord testified that Robert told her that he had "been using drugs and drinking a lot, and that he needed help." Rives McCord corroborated this testimony. Following Robert's admission, Rives and Linda McCord went to an acquaintance, J.P. Breaux for advise, because Robert had written checks on his parents' account without authorization. Mr. Breaux informed the McCords that Robert might have a drug problem; he gave the McCords a list of symptoms of drug abuse. Although the McCords could only recall some of the symptomsdisobedience, breaking curfew, talking back, verbal abuseRobert exhibited most of the symptoms on the list. Yet both parents testified that Robert had exhibited a lot of the symptoms since he was a toddler, and that most of the symptoms had gotten worse in September and October, following his enrollment at Nicholls State University.
In the admission records of ACDU, the parents told the staff that Robert lied and could not be trusted; that Robert had stolen money, alcohol, checks, and credit cards; that he was physically and verbally abusive; and that his friends changed frequently. In his testimony, Rives McCord further stated that because Robert often lied, he would have "some suspicion about whether or not it [the medical history given Dr. DeVille] was accurate."
Robert testified that while he drank when he was younger, he "never really got into drinking regularly ... until I was sixteenfifteen or so." He said that he started drinking heavily around Thanksgiving of 1983; that he smoked marijuana when he drank; that he did not experiment with other drugs until after he left ACDU (January, 1984); that he took money from his parents without authorization, but that he "had done that even before I had started experimenting with drinking or drugs"; that he had no blackouts before September of 1983; that the only blackout he experienced was on the night before he was admitted to ACDU; and that the history given to Dr. DeVille was accurate.
Based on our review of the record we find that the trial court was not clearly wrong in finding that Insurer did not meet its burden of proof in showing that symptoms of drug and alcohol abuse predated the policy's effective date. The trial court placed more emphasis on the testimony of Rives and Linda McCord because they lived with Robert and observed him daily, putting them in "the best position to advise *562 the Court regarding any symptoms and his [Robert's] behavior prior to September 30, 1983." Although the trial judge did note that the parents had an interest in the litigation, he said:
In fact, the Court is convinced that their [Rives and Linda McCord] testimony is true and accurate. The Court might point out that this is not a case of an uninsured person obtaining insurance and then making a claim shortly thereafter. Plaintiff testified that he had insurance prior to September 1983 but switched companies in order to avail himself of more economical rates. The Court does not believe that plaintiff would have done this if his son was exhibiting symptoms which required medical treatment. This fact has not had any bearing on the Court's finding that Robert McCord did not have a pre-existing condition. The Court merely refers to the testimony to point to one of the reasons why the Court finds the testimony of Mr. and Mrs. McCord truthful and accurate.
Evaluations of credibility are the province of the trial judge. Johnson v. State, Division of Administration, 510 So.2d 87 (La.App. 1st Cir.1987). Furthermore, in considering an expert's opinion, the trial judge has considerable discretion in accepting or rejecting his opinion after examination of, among other things, the expert's qualifications, his experience, and the facts upon which his opinion is based. Orgeron v. Dobkowski, 476 So.2d 458 (La.App. 1st Cir.1985). We find no error in the trial court's evaluation of the testimony, and affirm the award of medical benefits in the amount of $5,369.34 together with legal interest from date of judicial demand.
We further note that even if Insurer had been able to show some symptoms of drug and alcohol abuse, the language of the insurance policy is extremely broad. The policy could be read to mean that a person who experienced an occasional slight headache and blurred vision who was later diagnosed as having a brain tumor after the effective date of insurance coverage would be precluded from recovering benefits on the basis that the symptoms of the tumor manifested themselves prior to the policy's effective date. Any ambiguity is to be construed against the insurer, and in favor of coverage. 70th St. Food Store, Inc. v. Northeastern Fire Insurance Co. of Pennsylvania, 408 So.2d 958 (La.App. 2nd Cir.1981). As used in the policy, we believe that the word "symptoms" is ambiguous. Because the other two conditions which preclude coverage are prior medical treatment or prior consultation for sickness, a fair reading of the policy would be that an insured's symptoms must be such as would cause an ordinarily prudent person to seek medical diagnosis, care or treatment. In the instant case, Robert had always been a problem child, and some of his behaviors which were symptomatic of drug and alcohol abuse were also the same behaviors he had exhibited from childhood through adolescence. The nature of drug and alcohol abuse is such that the abuser hides anything which might reveal he has a problem; furthermore, as was the case with Robert, many drug and alcohol users are unaware or deny to themselves that they may be abusing drugs and alcohol. Additionally, Dr. DeVille testified that drug and alcohol abuse often go unrecognized by laymen and even by medical doctors who have not had special training. Under these circumstances, it is easy to see how the McCords or Robert failed to seek treatment prior to the time that they did.

ATTORNEY'S FEES AND PENALTIES
We agree with Insurer's contention that the trial court erred in awarding penalties and attorney's fees. Under LSA-R.S. 22:657, an insured is entitled to penalties and attorney's fees where the insurer is arbitrary and capricious in its refusal to pay the claim.
LSA-R.S. 22:657(A) provides, in pertinent part, as follows:
All claims arising under the terms of health and accident contracts issued in this state, ... shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the *563 policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist.... Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court.
According to the jurisprudence:
Whenever a claim is properly presented under a health and accident contract, it must be paid within 30 days, unless just and reasonable grounds exist, such as would put a reasonable and prudent businessman on his guard that the claim is unjust. What constitutes just and reasonable grounds for failing to pay has been held to be a question of fact to be determined from the circumstances of the case in question. Cheramie v. Board of Trustees, State Employees Group Benefit Program, 482 So.2d 742, 747, 748 (La.App. 1st Cir.1985). (Citations omitted.)
Applying these rules to the case before us, we conclude that Insurer's failure to pay was not without reasonable grounds. The information provided to Insurer consisted of the medical records of ACDU. These records would have placed a reasonable and prudent businessman on his guard that the claim was unjust because Robert's symptoms may have manifested themselves prior to September 30, 1983. For these reasons, we reverse the trial court's award of penalties and attorney's fees. We affirm that portion of the judgment awarding plaintiff $5,369.34 in medical benefits together with legal interest from date of judicial demand. Costs of this appeal to be assessed equally against appellant and appellee.
AFFIRMED IN PART AND REVERSED IN PART.