**James E. CLARK Sr.**

v.

**GOLDEN RULE INSURANCE COMPANY.**

Civ. A. No. 87–2529.

United States District Court,
W.D. Louisiana,
Shreveport Division.

Jan. 24, 1989.

Leroy H. Scott, Byron A. Richie, Shreveport, La., for plaintiff Clark.

Charles W. Salley, Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, La., Charles R. Davis and Barry H. Powell, Thomas, Price, Alston, Jones & Davis, Jackson, Miss., for defendant Golden Rule Ins. Co.

## MEMORANDUM OPINION

STAGG, Chief Judge.

James E. Clark Sr. filed this action seeking recovery of hospital and medical expenses together with penalties and attorney's fees pursuant to La.Rev.Stat. 22:657. Named as defendant is Golden Rule Insurance Company (hereinafter, "Golden Rule"). A bench trial was held on January 12–13, 1989.

### FINDINGS OF FACT:

Plaintiff, a 65–year–old male, is owner and president of Clark Custom Guns, Inc. and has been in the gunsmith business since 1952. During an aviation exam for a second class pilot's license in the late 1970's, plaintiff learned that he had high blood pressure.

In October of 1980, plaintiff saw Dr. Pierre V. Blanchard, a specialist in internal medicine. Plaintiff complained of abdominal and chest pains which Dr. Blanchard believed was the result of an abnormality in the digestive tract known as gastroesophageal reflux. Dr. Blanchard's alternative diagnosis was possible occult coronary disease. Laboratory work conducted during a visit to Dr. Blanchard's office established that plaintiff, on October 29, 1980, had a significant elevation in cholesterol and and triglyceride levels. At that time, plaintiff's cholesterol level was 531 and his triglyceride level was 400. Expert testimony established that current standards recommend the cholesterol and triglyceride levels to be below 200. Dr. Blanchard ordered another lab test on April 3, 1981. This test showed plaintiff's cholesterol level to be 246 and a triglyceride level of 783. Lab work conducted on September 22, 1981 revealed a cholesterol level of 622 and a triglyceride level of 2,085.

When Dr. Blanchard moved to another city, plaintiff began seeing Dr. Eddie D. Johnson, a general practitioner. Dr. Johnson first saw plaintiff on October 21, 1981, at which time plaintiff's cholesterol level was 380 and the triglyceride level was 700. At this time, plaintiff was placed on Lopid, a triglyceride lowering agent, and a low-fat diet. Between October 21, 1981 and October 21, 1985, plaintiff visited Dr. Johnson's office a total of nine times to have his cholesterol and triglyceride levels checked.

Though there was some fluctuation between visits, the levels remained abnormally high. Because of the abnormally high levels, Dr. Johnson increased the dosage of Lopid on February 28, 1985. At that time, plaintiff's cholesterol level was 326 with a triglyceride level of 1,500. In October of 1985, Dr. Johnson decided to refer plaintiff to Dr. Anil Chhabra, a specialist in cardiovascular diseases, for a cardiac stress test.

This test, along with a myocardial perfusion scan, was performed on November 1, 1985. The EKG performed during the stress test was normal. The myocardial scan showed no evidence of areas of decreased perfusion. This meant that there was no indication of artery blockage. The stress test, however, was "submaximal," which means that the preferred heart rate was not achieved. In this case, the cardiac rate achieved by plaintiff was only 66 per cent of the maximal expected. Neither Dr. Chhabra nor Dr. Clif Coffman, the diagnostic radiologist who performed the myocardial perfusion scan, found any indication of coronary disease.

On April 25, 1986, plaintiff completed an application for major medical insurance with Golden Rule Insurance Company. Question 7 on the application stated:

Has any person on this application, within the last 10 years, had any indication, diagnosis, or treatment of: (Circle Conditions)

(a) High blood pressure, heart disorder, stroke, or other cardiovascular disorder?

\* \* \* \* \* \*

(f) Any other disease, disorder (including alcohol or drug problems) or injury in the last five years?

If "yes" was answered to any of these questions, Question 8 on the application required the applicant to identify the "person, the condition or disorder involved, dates and results of treatment, name and location of doctor or hospital."

Plaintiff answered "yes" to Question 7(a), but only circled "high blood pressure." A "no" answer was entered for Question 7(f). In response to Question 8, plaintiff stated that he had had an exam and stress test by Dr. Anil Chhabra on November 1, 1985. Plaintiff also indicated that he had seen Dr. Johnson. Plaintiff did not disclose his history of high cholesterol and triglyceride levels. The policy was sent to Golden Rule by William E. Criswell, plaintiff's insurance agent.

On September 5, 1986, plaintiff was called by John D. Tracy, an employee of Golden Rule. Mr. Tracy asked plaintiff a number of questions contained on Golden Rule's "Blood Pressure Questionnaire." Based upon the answers given, Mr. Tracy believed plaintiff's blood pressure to be under control. Because of plaintiff's histo-

ry of high blood pressure, however, plaintiff was "ridered" with an increased deductible of $200 per calendar year, for a total deductible of $400. The Golden Rule policy became effective on October 1, 1986.

The policy was issued to Clark Custom Guns, Inc., which paid the premiums for the coverage of plaintiff and four other employees. Three employees elected not to obtain coverage. The coverage obtained by Mr. Clark replaced a policy that had been issued by the Lincoln National Life Insurance Company. Plaintiff chose to change insurance companies because Lincoln had raised their premiums.

While hunting for pheasants in Kansas in November of 1986, plaintiff experienced chest pains. Because the pains persisted, plaintiff went to see Dr. Coussons on January 16, 1987. According to Dr. Coussons, plaintiff related that he had chest pains when he would exert himself physically and that the pains had been occurring for eight to ten months. A treadmill test performed on January 20, 1987 was abnormal. The EKG performed during the test indicated a low blood supply to the heart. Plaintiff was admitted to the hospital a few days later so that Dr. Chhabra could perform a cardiocatherization, which is a dye test designed to evaluate the level of blockages in the arteries to the heart.

According to Dr. Chhabra, plaintiff gave a history of angina pectoris, described as retrosternal chest pain, for the past year. The cardiocatherization revealed severe blockages in all three arteries to the heart. Plaintiff was diagnosed as having coronary artery disease. As a result, coronary artery bypass surgery was recommended. This surgery was performed by Dr. Dale R. Stevenson, a cardiac surgeon, on January 27, 1987.

Coronary artery disease was described by Drs. Stevenson, Chhabra and Coussons as a progressive disease. Dr. Chhabra described it as a "slow, insidious process that comes over a period of time." Dr. Stevenson referred to as a "slow-developing disease." Based upon the amount of calcium felt by Dr. Stevenson in plaintiff's heart vessels, he believed that the condition was there for probably a year. The surgery performed by Dr. Stevenson was successful.

On February 25, 1987, Mr. Clark filed a claim with Golden Rule, seeking to recover the expenses incurred as a result of his coronary bypass surgery. On April 8, 1987, a letter was written to plaintiff by Randy J. Jenkins, a senior claims analyst for Golden Rule, notifying plaintiff that the policy had been voided. Plaintiff was advised in the letter that medical records had been obtained from Dr. Chhabra which, according to Mr. Jenkins, indicated that plaintiff had been treated since 1981 for elevated levels of cholesterol and triglycerides for which Lopid had been prescribed. The records also showed, according to Jenkins, that plaintiff had been experiencing chest pains since January of 1986. Based on this information, it was concluded by Golden Rule that plaintiff had not responded truthfully to Question 7(a), which asked whether, within the 10 years preceding the application, the plaintiff had had any indication, diagnosis or treatment of heart disorder or other cardiovascular disorder. In Mr. Jenkins' letter, Golden Rule expressly reserved its rights under the policy, including those under the preexisting conditions and incontestability provisions.

On May 11, 1987, plaintiff's counsel wrote a letter to Mr. Jenkins suggesting that Golden Rule had failed to investigate the claim adequately based on information provided by plaintiff and further stating that the preexisting condition clause did not preclude coverage because the condition was fully disclosed by plaintiff.

Mr. Jenkins responded in a four-page letter on May 29, 1987. The letter advised plaintiff's counsel that Golden Rule had obtained medical records from Dr. Johnson at the Summer Grove Clinic, Dr. Chhabra and the Willis Knighton Medical Center. Jenkins stated that these records indicated that Mr. Clark had been seen at the Summer Grove Clinic for elevated cholesterol and triglyceride levels beginning in 1981 and continuing through 1986. The letter further noted that on October 21, 1981 plaintiff was prescribed Lopid for the ele-

vated levels. Mr. Jenkins concluded that, based on the incontestability provision and plaintiff's failure to disclose the elevated levels, the policy was being voided. Mr. Jenkins stated, and the court agrees, that Golden Rule had no reason to investigate further plaintiff's health history based upon plaintiff's responses to questions during the telephone interview. Mr. Jenkins' letter prompted plaintiff to file the present action.

ANALYSIS OF LAW AND FACTS:

This case presented the court with essentially three legal issues: (1) whether the action was governed by the Employee Retirement Income Security Act of 1974 (hereinafter, "ERISA"), 29 U.S.C. § 1001 *et seq.;* (2) whether the policy should be voided under La.Rev.Stat. 22:619 because, as Golden Rule contends, plaintiff made, with an intent to deceive, a false statement in his insurance application that materially affected the risk involved; and (3) whether the benefits sought to be recovered are excluded under the policy because they were incurred due to a condition that existed prior to the effective date of the insurance coverage. The court finds the latter issue to be dispositive in defendant's favor.

PREEXISTING CONDITION?:

█ Under Louisiana law, which this court is *Erie*-bound to follow, the words of a contract must be given their generally prevailing meaning. La.Civ.Code Ann. art. 1946 (West 1987). "The policy of insurance is a contract, and therefore, when the terms are clear and unambiguous, the contract is to be enforced in accordance with its terms." *Sharp v. Federal Savings & Loan Insurance Corp.*, 858 F.2d 1042 (5th Cir.1988), *quoting from Odom v. Dixie Tie and Timber Company*, 458 So.2d 561, 563 (La.App. 2d Cir.1984). "The insurer must establish by a preponderance of the evidence that an illness, which it contends is excluded from coverage as a preexisting condition, did in fact predate the stipulated effective date of the policy." *Dear v. Blue Cross of Louisiana*, 511 So.2d 73, 74 (La. App. 3d Cir.1987); *accord, McCord v. Time Insurance Company*, 521 So.2d 558, 560 (La.App. 1st Cir.1988); *cf. Casey v. Propri-*

*etors Life Assurance Company*, 470 So.2d 339, 340 (La.App. 5th Cir.1985) ("Courts impose a strict burden on the insurer to prove that an exclusionary clause is applicable and, in the case of a health policy, that the alleged preexisting condition did in fact predate the effective date of the policy.") The insurer must produce evidence that is certain and decisive, leaving no room for speculation or assumption. *McCord*, 521 So.2d at 560.

With respect to preexisting conditions, the Golden Rule policy provided:

The Company will pay for *Covered Expenses* that:

(a) are incurred during the first 12 months of the *Covered Person's* insurance under the *Policy;* and

(b) result from a *pre-existing condition* that was:

(i) fully disclosed to the *Company* prior to the effective date of the *Covered Person's* insurance under the *Policy;* and

(ii) not excluded or limited by name or specific description.

Otherwise, loss due to *pre-existing conditions* will not be covered during the first 12 months after the effective date of the *Covered Person's* insurance under the *Policy.*

A *"pre-existing condition"* is a condition:

(1) for which the *Covered Person* received medical advice or treatment within the 12 months immediately preceding the date he or she became insured under the *Policy;* or

(2) which, in the opinion of a qualified *physician:*

(a) began prior to the date of the *Covered Person's* coverage under the *Policy;* and

(b) produced symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the 12 months immediately preceding the *Covered Person's* effective date of insurance under the Policy.

█ Plaintiff argues that coverage is not precluded because the preexisting condition

was fully disclosed to Golden Rule prior to October 1, 1986 and not otherwise excluded or limited. Plaintiff premises this argument on his belief that he gave defendant enough information to constitute the equivalent of full disclosure. More specifically, plaintiff provided Golden Rule with the fact that he was a 63–year–old male with high blood pressure and had had a stress test. This information, plaintiff argues, should have been enough to put Golden Rule on its guard that a cardiac problem existed.

As indicated, the words of a contract must be given their generally prevailing meaning. The "condition" for which Mr. Clark underwent surgery and now seeks to recover benefits was coronary artery disease. Though the court believes that plaintiff was unaware that he had this disease at the time he completed the application, it is clear that this condition was not disclosed—much less "fully disclosed." Dr. F. Brobson Lutz, an expert in internal medicine, testified that plaintiff suffered from athrosclerosis, which is hardening caused by lipids. High cholesterol and triglyceride levels are indicative of a build-up of lipids in the arteries. In fact, Dr. Lutz testified that when there is a high cholesterol level combined with a triglyceride level that exceeds 1,000, blood in a tube would look like chicken fat. It is clear that plaintiff was aware of his elevated cholesterol and triglyceride levels. This fact, irrespective of intent to deceive, was not disclosed on the application. Thus, plaintiff's argument that his preexisting condition was fully disclosed is without merit.

■ The next question, then, is whether Golden Rule has satisfied its burden proving that plaintiff's coronary artery disease was a preexisting condition. Defendant argues that it has satisfied its burden because there is proof that plaintiff "received medical advice or treatment within the 12 months immediately preceding" October 1, 1986. Dr. Johnson's testimony establishes that, as of October 21, 1985, plaintiff was taking Lopid twice a day. Lopid was taken in an effort to treat and lower plaintiff's triglyceride level. As stated, this level shows a build-up of lipids in the arteries to the heart. It was a severe build-up of lipids in the three main arteries to plaintiff's heart which resulted in coronary artery disease and required the coronary bypass surgery. Giving the word "treatment" its generally prevailing meaning, the court concludes that the taking of Lipid constituted treatment of a condition which resulted in the coronary bypass surgery.

The alternative definition of the preexisting condition provided in the policy, however, provides defendant with an even stronger argument. Coverage under the Golden Rule policy became effective on October 1, 1986. Plaintiff's surgery was performed less than four months later. In the opinion of Dr. Stevenson, the surgeon who performed the surgery, and Dr. Lutz, plaintiff's coronary artery disease began at least one year prior to the surgery. These opinions were based on the fact that Dr. Stevenson found a build-up of calcium in the arteries to plaintiff's heart. Calcified deposits, according to Dr. Lutz, are caused by an abnormal tissue build-up over a long period of time. Dr. Lutz believed that the year estimate was conservative. Under the preexisting condition provision, therefore, "in the opinion of a qualified physician," the condition "began prior to the date of the Covered Person's coverage under the Policy."

The next question under the policy is whether the condition "produced symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the 12 months immediately preceding" the effective date of coverage. Based upon the history given by plaintiff to Drs. Johnson, Chhabra and Stevenson in January of 1987, the court is satisfied that plaintiff was having chest pains or, at the very least, tightness in the chest for a year prior to his surgery. In addition to chest pains, plaintiff was experiencing abnormally high cholesterol and triglyceride levels. In the opinions of Drs. Stevenson, Chhabra, Coussons and Lutz, these were symptoms, resulting from the blockage, which would have caused an ordinarily prudent person to seek diagnosis or treatment within the 12 months immediately preceding the effective date of coverage. In fact, it was the

elevated levels that prompted Dr. Johnson, in late October of 1985, to refer plaintiff to a cardiologist for a stress test and myocardial perfusion scan.

Based on the foregoing, the court is satisfied that Golden Rule has met the requisite burden of proof by coming forward with evidence that is "certain and decisive, leaving no room for speculation or assumption" that coverage should be excluded under the preexisting conditions provisions. *See, McCord v. Time Insurance Company,* 521 So.2d at 560. Though Golden Rule will undoubtedly agree with the court's result, it will surely disagree with the analysis employed by the court. Golden Rule contended that the claim was governed by ERISA and that the court's scope of review, therefore, was limited to determining whether the denial of benefits was arbitrary and capricious. *See generally, Denton v. First National Bank of Waco, Texas,* 765 F.2d 1295, 1300 (5th Cir.1985). For this reason, the court will address the issue of ERISA's applicability.

THE ELEVENTH HOUR DEFENSE:

■ In an amended answer filed less than one month before trial, Golden Rule asserted that plaintiff's state claims were preempted by ERISA. Dianna Benton, supervisor of the underwriting department at Golden Rule, is the individual responsible for training Golden Rule employees how to market Golden Rule's multiple employer trust. Ms. Benton described the product as a plan offered to employers with a small number of employees so that the employer can have the benefit of an otherwise unavailable group insurance package. Employers have the options of several different types of coverage. The employer makes a decision as to what coverage will be provided. The employer must pay at least 50 per cent of the premiums, and at least 75 per cent of the employer's employees must be covered by the plan. A bill for the total premium is sent directly to the employer. In turn, Golden Rule will accept only one check from the employer for premiums of all covered employees.

The employer and each participating employee must submit a separate application.

Golden Rule reviews the employer's application first to determine whether the occupation is eligible for coverage. Golden Rule then reviews each individual application to determine whether coverage will be available to that employee. Certificates of coverage are sent to the employers who, in turn, are responsible for delivering them to the employees. Based on this arrangement, Golden Rule argues that the employer, in this case, Clark Custom Guns, Inc., established a "plan" within the meaning of ERISA. The court disagrees.

Section 3(1) of ERISA, 29 U.S.C. § 1002(1), defines "employee welfare benefit plan" as:

Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise, (a) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability....

The principal issue presented by Golden Rule's argument is whether the policy issued by the Golden Rule Services Trust (hereinafter, "GRST") to Clark Custom Guns, Inc. was "established or maintained by an employer or employee organization." It is clear, and Golden Rule has not contended otherwise, that the GRST is not, in and of itself, an employee welfare benefit plan. "The courts, congressional committees and the Secretary uniformly have held that [multiple employer trusts] are not [employee welfare benefit plans]." *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982) (citations omitted).

Defendant's biggest hurdle in proving that the policy sold to Clark Custom Guns, Inc. constitutes an ERISA plan is *Taggart Corporation v. Life and Health Benefits Administration, Inc.,* 617 F.2d 1208 (5th Cir.1980), *cert. denied sub nom. Taggart Corp. v. Efros,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981). In *Taggart,* the arrangement was described as follows:

The Security Multiple Employers Trust [SMET], appellee, provides group insurance to employers too small to qualify for group rates on their own. Employers subscribe to SMET and thereby become members of SMET's 'group' of subscribers; SMET then pools the 'group's' premiums and purchases insurance on their behalf. Taggart Corp., appellant, whose sole employee is Stanley M. Kansas, appellant, subscribed to SMET in 1986.

*Id.* at 1210. When Mr. Kansas sought benefits on behalf of his wife, SMET advised him that the trust carrier was denying coverage because of alleged misrepresentations in his insurance application. Kansas then filed an action under ERISA, seeking recovery of benefits. The district court dismissed the action for lack of subject matter jurisdiction, holding that SMET was not an ERISA plan. *Taggert Corp. v. Efros*, 475 F.Supp. 124 (S.D.Tex.1979). The Fifth Circuit affirmed the district court and held that SMET was neither established nor maintained by a statutory "employer" or "employee organization," as required by 29 U.S.C. §§ 1002(4) and (5). 617 F.2d at 1210. The Court reasoned:

> Neither Taggart Corp. nor any other employer participates in SMET's day-to-day operation or administration. The venture was established and is 'maintained by entrepreneurs for the purpose of marketing products or services to others.... [Such an enterprise is neither] established [n]or maintained by the appropriate parties to confer ERISA jurisdiction.'

*Id.* (Citation omitted).

Though the issues litigated by the parties in *Taggart* centered on whether the multiple employer trust constituted an ERISA plan, the Secretary of Labor, who filed an amicus brief, urged the court to uphold federal jurisdiction by declaring that Taggart Corp.'s subscription to the multiple employer trust itself established an ERISA plan. *Id.* at 1211.

The Fifth Circuit, albeit *in dicta*, rejected this suggestion. In so doing, the Fifth Circuit stated:

Considering the history, structure and purposes of ERISA, we cannot believe that that Act regulates bare purchases of health insurance where, as here, the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits.

\* \* \* \* \* \*

The supposed Taggart 'plan' has no assets and is liable for no benefits. There is nothing to be placed in trust, so there is no trust. The corporation did no more than make payments to a purveyor of insurance, patently for tax reasons.... There simply exist no assets for ERISA's statutory safeguards to protect.....

Acceptance of the Secretary's position conceivably could result in Taggart's criminal prosecution. 29 U.S.C.A. § 1131 (West, 1975). No such anomolous result is required on the facts of this case. *Id. See also, Baucom v. Pilot Life Insurance Company*, 674 F.Supp. 1175, 1181 (M.D.N.C.1987) ("Established or maintained" "requires some degree of active involvement in the plan's founding and administration."); *Hamberlin v. VIP Insurance Trust*, 434 F.Supp. 1196, 1198–99 (D.Ariz.1977); *Bell v. Employee Security Benefit Association*, 437 F.Supp. 382, 396 (D.Kan.1977).

There simply is no substantive distinction between the level of participation by Taggart Corp. and that of Clark Custom Guns, Inc. Plaintiff, as the owner of the entity, merely purchased insurance that was sold to him by an independent agent. Claims were submitted to and processed through Golden Rule. The only assets contributed were premiums paid by plaintiff's business. There is no evidentiary basis permitting this court to conclude that Clark Custom Guns, Inc. directly or indirectly owned, controlled, administered or assumed responsibility for the policy or its benefits. *See, Taggart, supra.* Based on the foregoing, the court finds that plaintiff's employer neither established nor maintained an employee welfare benefit plan. Because the facts in this case are virtually indistin-

guishable from those in *Taggart*, the holding in *Donovan v. Dillingham, supra*, does not require a different result. 688 F.2d at 1375.

Several other factors further indicate that the policy issued to plaintiff through his employer was not an ERISA plan. Specifically, there was no plan description in accordance with 29 U.S.C. § 1022(a)(2) and (b). The record is devoid of proof that an annual report was filed in accordance with 29 U.S.C. § 1023. There were no "named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* at § 1102. As a result of this deficiency, there was no compliance with § 1133(2) which requires that the plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by *the appropriate named fiduciary of the decision denying the claim*." (Emphasis added.) In fact, Ms. Benton and Ms. Perry testified that they did not understand the meaning of the word "fiduciary." These employees of Golden Rule, though vested with substantial control over the administration of the GRST, had little to no knowledge of ERISA nor the rights afforded by the Act or requirements of a fiduciary. The certificate issued to plaintiff certainly did not purport to be an ERISA plan, as it stated that, "[a]ny provision of the policy which, on its effective date, is in conflict with the statutes of the State in which it is delivered is hereby amended to conform with the minimum requirements of those statutes." Given these factors and the reasoning in *Taggart, supra*, Golden Rule's veiled effort to turn a straightforward policy of insurance into a federally-regulated ERISA plan is without merit.

## JUDGMENT

This cause having come before the Honorable Tom Stagg for a nonjury trial on January 12–13, 1989, and having determined that on the basis of evidence submitted and applicable law,

IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff shall take nothing, and the action against the defendant shall be DISMISSED WITH PREJUDICE, at plaintiff's costs.