858 F.2d 1042
 Alex SHARP, Individually and on behalf of participating
Underwriters at Lloyd's, London, Plaintiff-Appellee,
v.
FEDERAL SAVINGS AND LOAN INSURANCE CORP., as Receiver for
Alliance Federal Savings & Loan Association,
Defendant-Appellant.
 No. 87-3676.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 27, 1988.
 
 Larry M. Berkow, Atty. Federal Home Loan Bank Bd., Washington, D.C., Harold B. Carter, Jr., New Orleans, La., for defendant-appellant.
 Harvey C. Koch, Gary J. Rouse, New Orleans, La., P. Michael Jung, Duncan L. Clore, Dallas, Tex., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, and GOLDBERG and GARWOOD, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 The Federal Savings and Loan Insurance Corporation ("FSLIC") requires all member banks to purchase insurance coverage under Savings and Loan Blanket Bond Standard Form No. 22 ("Form 22"), as drafted and subsequently modified by the Sureties Association of America (the "SAA"). Form 22 provides insurance against, among other things, loss by fraud or dishonesty of Savings and Loan employees. Form 22 insures only against losses discovered during the coverage of the bond. This case calls upon us to construe the termination and notice provisions of Form 22 and to determine whether it covers losses discovered after institution of a conservatorship by the Federal Home Loan Bank Board ("FHLBB"), but before insurance underwriters sent written notice of cancellation to the Federal Home Loan Bank ("FHLB").
 
 
 2
 We conclude that under principles of contract law applied in Louisiana, the plain meaning of the bond controls and that coverage under Form 22 terminates immediately upon commencement of a conservatorship, with or without notice to the FHLB. The order of the district court is accordingly affirmed.
 
 I. FACTS
 
 3
 This case was heard on stipulated facts.
 
 
 4
 Alliance Federal Savings and Loan Association ("Alliance Federal") was a federally chartered savings and loan association located in Kenner, Louisiana. FSLIC requires all member banks to purchase insurance coverage pursuant to Form 22. Unable to purchase insurance on the domestic market, Alliance Federal purchased a thirty-six month Form 22 bond, from underwriters at Lloyds, London ("Underwriters"). The Bond was effective November 30, 1984 (the "Bond").
 
 
 5
 Two months later, on January 31, 1985, the FHLBB determined that due to unsound practices and violations of the law, Alliance Federal was in an unsafe condition to transact business. Pursuant to its authority under 12 U.S.C. Sec. 1464, the FHLBB appointed John J. Daly as conservator. The next day Daly took control of Alliance and fired all of its senior management.
 
 
 6
 Shortly after Daly assumed his management responsibilities, FSLIC discovered that losses allegedly covered by the bond had occurred. On February 8, 1985, counsel for Alliance Federal gave Underwriters notice of these losses.[1] On February 13, 1985, Underwriters acknowledged that they had received the notice.
 
 
 7
 On February 21, 1985, Underwriters notified Kenneth McCollum at Alliance Insurance, and Counsel for Alliance Federal, of their contention that the bond automatically terminated upon Daly's appointment as conservator. No separate notice of termination or cancellation was sent to the FHLB in Dallas.
 
 
 8
 On April 30, 1985, Underwriters mailed a check to Alliance Federal bearing the legend "Pro-rata return premium, placement fee and tax," in the amount of $27,069.76. The cover letter on this check was addressed "Dear Gentlemen:" and no notice of the return premium was sent either to McCollum at Alliance, or to Counsel for Alliance Federal.[2] The check was negotiated by Alliance.[3]
 
 
 9
 On August 23, 1985, the FHLBB appointed FSLIC as receiver for Alliance Federal, and on October 23, 1985, Alliance Federal filed a second proof of loss for losses discovered after commencement of the FSLIC receivership.
 
 
 10
 Underwriters then sought declaratory relief finding that the Bond terminated upon appointment of Daly as conservator. FSLIC responded with an answer and counterclaim seeking a declaration that the Bond did not terminate on the date the Conservator was appointed because Underwriters failed to give the required notice to the Federal Home Loan Bank. The district court held for Underwriters, finding that the notice provisions of Section 12 were limited to terminations by the insured or underwriter, and did not apply to takeovers, conservatorships or FSLCIC receiverships. FSLIC has appealed.
 
 II. DISCUSSION
 
 11
 The termination provision of Form 22, as revised to 1982, provides:
 
 
 12
 Section 12. This bond shall be deemed terminated or cancelled as an entirety--(a) 60 days after the receipt by the insured of a written notice from the Underwriter of its desire to terminate or cancel this bond, or (b) immediately upon the receipt by the Underwriter of a written request from the Insured to terminate or cancel this bond, or (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by the State or Federal officials, or (d) immediately upon the taking over of the Insured by another institution. The Underwriter shall, on request, refund to the insured the unearned premium, computed pro rata, if this bond be terminated or canceled or reduced by notice from, or at the instance of, the Underwriter, or if terminated or canceled as provided in subsection (c) or (d) of this paragraph. The Underwriter shall refund to the Insured the unearned premium computed at short rates if this bond be terminated or reduced by notice from, or at the instance of, the Insured.
 
 
 13
 ....
 
 
 14
 If the insured be a Federal Savings and Loan Association or a state chartered association insured by the Federal Savings and Loan Insurance Corporation, no termination or cancelation of this bond in its entirety, whether by the Insured or the Underwriter, shall take effect prior to the expiration of ten days from the receipt by the Federal Home Loan Bank of which the Insured is a member of written notice of such termination or cancelation unless an earlier date of termination or cancelation is approved by said Federal Home Loan Bank.
 
 
 15
 (emphasis added). Section 4 of the bond states, "This bond applies to loss discovered by the Insured during the bond period." Losses discovered after an effective termination are therefore not covered. Central Progressive Bank v. Fireman's Fund Insurance Co., 658 F.2d 377, 380 (5th Cir.1981). This case turns on the construction of Section 12 under Louisiana law. In Louisiana "An insurance policy is a contract, and the rules established for the construction of written instruments apply to contracts of insurance." Harmon v. Lumbermens Mutual Casualty Co., 247 La. 263, 170 So.2d 646, 651 (1965); see Jennings v. Louisiana & Southern Life Insurance Co., 280 So.2d 297, 300 (La.Ct.App.1973). We therefore turn to the rules of contract interpretation in Louisiana.
 
 A. Plain Meaning
 
 16
 "The words of a contract must be given their generally prevailing meaning." La.Civ.Code Ann. Art. 1946 (West 1977). "A policy of insurance is a contract," and therefore, when the "terms are clear and unambiguous," the contract "is to be enforced in accordance with its terms." Odom v. Dixie Tie and Timber Co., 458 So.2d 561, 563 (La.Ct.App.1984); see Leenerts Farms, Inc. v. Rogers, 421 So.2d 216, 218 (La.1982); Gulf Building Services, Inc. v. Travelers Indemnity Co., 435 So.2d 477, 478 (La.Ct.App.), cert. denied, 441 So.2d 749 (La.1983); Jennings, 280 So.2d at 300.
 
 
 17
 "[W]hile all ambiguities must be construed in favor of the insured and against the insurer, courts have no authority to change or alter [a contract's] terms under the guise of interpretation when such terms are couched in clear and unambiguous language." Moncrief v. Blue Cross-Blue Shield, 472 So.2d 299, 301 (La.Ct.App.1985). As we have said, "The special rules of interpretation do indeed apply only when there is an ambiguity; courts ought not to strain to find such ambiguities, if, in so doing, they defeat probable intentions of the parties. This is so even when the result is an apparently harsh consequence to the insured." Calcasieu-Marine National Bank v. American Employers' Insurance Co., 533 F.2d 290, 296 (5th Cir.), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).
 
 
 18
 The language of the cancellation provision of Section 12 is clear and its effect is undisputed. As set forth above, Section 12 sets out four ways of terminating the bond: (a) by the underwriter; (b) by the insured; (c) upon takeover by a receiver, liquidator, state or federal officials; and (d) takeover by another institution.
 
 
 19
 This dispute concerns the notice provision of Section 12, which provides that "no termination or cancelation of this bond in its entirety, whether by the Insured or the Underwriter, shall take effect prior to the expiration of ten days from the receipt by Federal Home Loan Bank of which the Insured is a member of written notice of such termination or cancelation." By its terms, this provision seems to distinguish type (a) and (b) terminations from type (c) and (d) terminations. Appellants argue that this conclusion is thrown into doubt by the presence of the word "whether." They concede that without the word "whether," the interpretation of Section 12 would be undisputed. The notice provision would apply only to terminations by the insured or underwriter. The question is whether the word "whether" indicates that the alternatives which follow comprise the universe, or should be read as meaning "including but not limited to."
 
 
 20
 To ascertain the plain meaning of the word "whether" we turn to the dictionary. The American Heritage Dictionary (New College Edition, 1978) offers three definitions. First, "whether" is defined as meaning, "if the case is that." This phrase, if used in place of the word "whether," would remove all doubt. For example, using "if the case is that," in place of the word "whether," the notice provision would read as follows: "no termination ... of this bond ..., if the case is that it is by the Insured or the Underwriter, shall take effect prior to the expiration of ten days from [receipt of notice by the FHLB]." The language is stilted but the meaning is clear. The second definition offered uses the word whether as if it were a colon(":"), to introduce a list of alternatives, defining the word as, "If it happens that; in case. Used to introduce the first of a set of possibilities." Again, if instead of the word "whether," a colon were inserted, the meaning of the sentence would be unambiguous. Terminations by the insured or the underwriter are on the list; terminations by other methods are not. Finally, "whether" is defined as a synonym for the word "either." This final definition offers the least room for doubt. Termination, "either by the insured or the underwriter," unambiguously offers the only two situations where the notice provision applies, even if other methods of termination exist.
 
 
 21
 Thus, giving the word "whether" all of its common meanings, we find that the phrase "whether by the Insured or the Underwriter" is unambiguous in its import. It sets forth the two situations in which the notice provision applies and excludes all others.
 
 
 22
 This construction is consistent with the structure of the cancellation provision. Distinguishing type (a) and (b) terminations from type (c) and (d) terminations is appropriate for several reasons. First, terminations by receivership or takeover can be distinguished from terminations by the insurer or insured, in that a fidelity bond insures the fidelity of the employees and officers of the bank. In the case of a receivership or a takeover, the officials who purchased the bond to insure their own honesty are no longer in control of the institution. Takeover or receivership would substantially alter the character of the risk covered by the policy. Second, voluntary terminations by the insured or underwriter are in the control of the parties to the contract. Termination by receivership or takeover involve termination of the contract by a specified exogenous event that has nothing to do with the relationship between the insurer and the insured. These two distinctions give rise to a third which provides a powerful reason why the insurer has an interest in automatic termination of the contract. When termination is by the insured or the underwriter, the other party will necessarily have notice of termination of the contract. In the case of a receivership or takeover, the insurer may never receive notice of any kind. Without notice, the insurer would have no reason to notify the FHLB, and might inadvertently find itself insuring a risk substantially different from that originally contemplated. See Continental Insurance Co. v. Federal Savings & Loan Insurance Corp., No. CV 84-9708 (C.D.Cal. Jan. 16, 1986).
 
 
 23
 Thus, the plain language of the bond unambiguously points to the conclusion that the bond terminated immediately upon the commencement of the conservatorship.
 
 
 24
 B. The Rule That Insurance Contracts Are to Be Construed In
 
 Favor of Coverage Does Not Apply
 
 25
 Appellants argue that ambiguities in insurance contracts are to be construed strictly against the underwriter. Borden, Inc. v. Howard Trucking Co., 454 So.2d 1081, 1090 (La.1984); Gipson v. Yosemite Insurance Co., 494 So.2d 1290, 1291 (La.App. 2d Cir.1986). This principle does not apply in this case for two reasons. First and foremost, we have already demonstrated that this contract is not ambiguous, and therefore even giving the contract a strict construction we would reach the same result. Furthermore, in Calcasieu-Marine National Bank v. American Employers' Insurance Co., 533 F.2d 290, 296 n. 6 (5th Cir.), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), we noted that this rule is an extension of the general rule that a contract is construed strictly against the party who drafted it, and that where, by contrast, the contract was in fact a joint effort of both insurers and the insureds, the principle need not apply. In construing a similar bankers' blanket bond this court stated,
 
 
 26
 One commonly expressed rationale for this rule is that it would be unjust to construe an ambiguous provision in favor of the party that drafted it. This rationale may not be applicable here, in view of the fact that the banker's blanket bond being construed was drafted by a joint effort of the American Bankers' Association and the American Surety Association. All parties are, apparently, members of these respective associations, and it would appear, therefore, that each party was equally responsible for the policy language.
 
 
 27
 Id.
 
 
 28
 Form 22 was a product of such a joint effort. Indeed, FSLIC, which in this case has stepped into the shoes of the insured, is the very institution which required that Underwriters issue their coverage under Form 22 in the first place. Therefore, even if the language were ambiguous, there would be no reason to weigh our construction heavily in favor of coverage.
 
 C. Drafting History of the Bond
 
 29
 There is no question that in the case of ambiguous terms, statements by the insurance contract's drafters are persuasive. Nardelli v. Stuyvesant Insurance Co., 269 F.2d 592 (5th Cir.1959). However, as we have pointed out, the terms of this contract are not ambiguous. Moreover, though the drafting history of the bond does cast some doubt upon whether the drafters thoroughly considered the language of Section 12, nothing in the history casts serious doubt on the import of the plain words. Appellants make two basic arguments.
 
 
 30
 First they point out that when Form 22 was drafted in 1938 by the SAA, its predecessor was the Form 16 Bond ("Form 16"). Form 22 provided broader coverage than its predecessor, but much of the language of Form 16 was used in Form 22. Apparently, the notice provision of Form 16 appeared as a separate endorsement attached to the bond, and the cancellation provision of Form 16 provided only for cancellation by the insured or the underwriter. Form 22 made two relevant changes: the separate endorsement was moved into the body of the bond; and the cancellation provision was expanded to include two additional forms of cancellation.
 
 
 31
 On the one hand, this suggests that initially the notice provision comprehended the universe of forms of cancellation. Appellants argue that when the drafters expanded the cancellation provision, it was a mere oversight that they failed to expand the notice provision to include the two new grounds for cancellation. This history can also be considered in the opposite light, however. The two changes were made together, and as we noted above, the first two forms of termination are substantially different from the second two forms. The fact that these two changes were made at the same time seems on the contrary to suggest that the choice not to expand the notice provision was a conscious one.
 
 
 32
 Appellants also cite us to analysis of the new bond by the SAA. They note that in the following section of the SAA analysis, the cancellation provision and the notice provision were considered together:
 
 
 33
 The Cancellation Condition has been amplified to provide for the termination not only by notice but also by the taking over of the Insured by a receiver or other liquidator or by state or Federal officials or upon the taking over of the insured by another institution.
 
 
 34
 As previously commented upon under the heading "NOTICE-PROOF-LEGAL PROCEEDINGS," provision has been made in this Condition to provide with respect to certain Associations, that advance notice of termination be given to the Federal Home Loan Bank of which the Insured is a member.
 
 
 35
 Report of the Committee on Fidelity Bonds and Insurance, Building and Loan Annals of the United Building and Loan League (Now called United States League of Savings Institutions), p. 516 (1938). This analysis is no more persuasive than the drafting history itself. It shows merely that the two provisions were considered together. It says nothing about whether notice is necessary for all types of cancellation. Again, the fact that the notice and cancellation provisions were considered together suggests that type (a) and (b) terminations may have been intentionally distinguished from type (c) and (d) terminations. Thus, neither the SAA analysis nor the drafting history alter our initial conclusion that the plain language of the bond controls.
 
 D. Estoppel
 
 36
 Appellees argue that appellants are estopped from asserting their claim because they negotiated a return premium check sent to them on April 30, 1988. We need not reach this question because the plain language of the bond is dispositive. We note in passing, however, that there are several facts on the record which cause us to question whether the fact that Alliance cashed the return premium check should be deemed to constitute assent to Underwriters' interpretation of the Bond. Even after Underwriters knew that Alliance Federal was represented by counsel, Underwriters continued to correspond with Ken McCollum at Alliance Insurance without informing Counsel or Daly, the conservator. It was ultimately McCollum who requested the return premium. Even then, Underwriters did not mail the check, or send notice to, Counsel, Daly or McCollum. They simply addressed the cover letter to "Gentlemen." Apparently, Counsel and Daly had no notice that the check had been cashed until more than a year later, at which point they tendered the premium back to Underwriters. We hesitate to find a meeting of the minds in these facts.
 
 
 37
 Even if the negotiation of the return premium were deemed to constitute assent, Underwriters only returned the premiums for 31 months. They retained the premiums through April 30. Thus, we would be forced to reach the question of bond interpretation, at least for the losses discovered before April 30.
 
 III. CONCLUSION
 
 38
 We are aware that the conclusion we have reached may seem harsh to FSLIC, an institution beleaguered by thousands of thrift failures nationwide. The harshness of the rule is softened by two considerations. First, it is FSLIC itself that has chosen to require coverage under Form 22 as a condition of FSLIC membership. If it wishes an additional time period for discovering losses subsequent to establishment of a conservatorship, FSLIC need only alter its regulations. Second, FSLIC and the FHLB have plenary power to examine the books of member banks prior to the institution of conservatorships or takeovers. Here, for example, the losses reported on February 8 represented substantially the same losses that led the FHLB to appoint a conservator in the first instance. The sole effect of our decision is to require FSLIC and the FHLB to do their homework prior to the institution of a conservatorship.
 
 
 39
 In the face of the clear language of Form 22, we hesitate to rewrite judicially a standard form bond that has had a longer existance than FSLIC. If FSLIC finds the coverage provided by Form 22 inadequate, it need only require member banks to purchase an additional discovery period in the event of a type (c) termination.
 
 
 40
 For the reasons stated above, the order of the district court is
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 Counsel for Alliance Federal filed a Proof of Loss on August 1, 1985
 
 
 [2]
 The amount of $27,069.76 represents the entire premium for 36 months less five months premium at approximately $910/month, plus tax and fees of approximately $1100. Thus, though we have not been briefed on the subject, it would seem that Underwriters only returned the premium for coverage subsequent to April 30, 1985, the date of the cover letter. It therefore appears that Alliance and FSLIC are not under any circumstances estopped from asserting losses discovered before April 30, 1985
 
 
 [3]
 When Alliance Federal discovered that Underwriters were arguing that acceptance of the return premium estopped Alliance from asserting claims after cancellation, they tendered a check in the amount of the return premium to counsel for Underwriters