**FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, in its corporate capacity, Plaintiff,**

v.

**TRANSAMERICA INSURANCE COMPANY, a California insurance corporation, Defendant and Third–Party Plaintiff,**

v.

**John F. ROSCH, et al.**

**No. 87 C 6996.**

United States District Court, N.D. Illinois, E.D.

Jan. 25, 1989.

was the selfsame defendant who has just lost his        appeal in *Doe*—Stephen Gorny.

William J. McKenna, John F. Zabriskie, Hopkins & Sutter, Chicago, Ill., for plaintiff.

Gary L. Griffin, Neal R. Novak, McNeela & Griffin, Ltd., Chicago, Ill., for defendant and third-party plaintiff.

Michael A. Braun, Ira N. Helfgot, Braun & Rivkin, Ltd., Chicago, Ill., for third-party defendant John F. Rosch.

Michael Weininger, Katz Randall & Weinberg, Chicago, Ill., for third-party defendant John Edwards.

Elliott D. Hartstein, Cohon, Raizes & Regal, Chicago, Ill., Mark S. Werbner, Marc W. Joseph, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for third-party defendant Harry Sugg.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiff Federal Savings and Loan Insurance Corporation ("FSLIC") is a corporate instrumentality and an agency of the United States, operating under the direction of the Federal Home Loan Bank Board ("FHLBB"). FSLIC filed its one-count complaint against defendant Transamerica Insurance Company ("Transamerica") on August 7, 1987. The complaint alleges that Transamerica wrongfully denied FSLIC's claim under a Transamerica savings and loan blanket bond is-

sued to Glen Ellyn Savings and Loan Association ("Glen Ellyn") in June of 1982.[1]

Transamerica filed its amended answer and affirmative defenses to the complaint on September 21, 1987. FSLIC and Transamerica have filed cross-motions for summary judgment with regard to the first and third affirmative defenses raised by Transamerica. Additionally, Transamerica seeks summary judgment on the grounds raised in its second, fifth, seventh and eighth affirmative defenses.

A district court should grant summary judgment only if the pleadings, depositions, answers to interrogatories, admissions and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For the reasons set forth below, FSLIC's motion for summary judgment is denied. Transamerica's motion for summary judgment is granted with respect to its eighth affirmative defense. In all other respects, Transamerica's motion for summary judgment is denied.

## BACKGROUND FACTS

A. *Rosch's Activities at Glen Ellyn.*

In December of 1974, John F. Rosch ("Rosch") became President and Managing Officer, as well as a director and shareholder of Glen Ellyn. (Transamerica's Statement of Material Fact, ¶ 4.) In 1976, Glen Ellyn consented to the entry of an order by FSLIC to cease and desist at least 21 practices which FSLIC had determined to be in violation of federal and Illinois laws and regulations. FSLIC charged that these violations constituted unsafe and unsound banking practices. (Stipulation and Consent to Entry of Order to Cease and Desist, Exhibit 3 to FSLIC's Statement of Material Fact, p. 9 *et seq.*)

Despite the 1976 cease and desist order, Glen Ellyn continued to violate federal and state savings and loan regulations. (FHLBB Report of Special Limited Joint Examination, Exhibit 5 to FSLIC's Statement of Material Fact.) An FHLBB investigation of Glen Ellyn revealed that between 1981 and mid-1984 the savings and loan association lost a total of $1.2 million. *Id.* FSLIC and Transamerica apparently agree that Glen Ellyn's financial troubles were due in large part to malfeasance on the part of Glen Ellyn's president, Rosch, and James E. Reagin, a Texas real estate developer. (*Id.* at p. 1.) ("The comments and conclusions presented in this report reflect the activities of President and Managing Officer John F. Rosch, who conducted the affairs of the association in an unsafe and unsound manner. These activities resulted in the insolvency of the institution.").

At a meeting of its board of directors on June 19, 1984, Rosch made an oral tender offer to the other members of the board of directors to acquire 100% of the shares presently issued and outstanding of Glen Ellyn. At the time of the offer, Rosch owned approximately 16% of Glen Ellyn's outstanding shares. On July 3, 1984, four of Glen Ellyn's directors resigned. As of July 3, 1984, Rosch held himself out as the sole owner of all of the outstanding common stock of Glen Ellyn and purported to nominate and select five new members of the board of directors of Glen Ellyn. (Exhibit 19 to FSLIC's Statement of Material Fact.) A report by the FHLBB noted that most of the new directors were Rosch's "subordinates" at Glen Ellyn. (Exhibit 20 to FSLIC's Statement of Material Fact.) Two days later, Rosch and two of the members of the board of directors passed a resolution that directed Glen Ellyn's legal counsel to draw up an amendment to the by-laws that would reduce the number of members of the board of directors from seven to three. (Action by Sole Shareholder and Board of Directors, Exhibit 19 to FSLIC's Statement of Material Fact, p. 2.) It is unclear in the record whether this resolution was ever implemented.

1. Prior to September 19, 1985, Glen Ellyn was an Illinois state-chartered savings and loan association whose accounts were insured by FSLIC pursuant to 12 U.S.C. § 1726. Transamerica is a California insurance corporation with its principal place of business in San Francisco, California. Transamerica is licensed to do business and is doing business in Illinois.

Even before Rosch had acquired all of the common shares of Glen Ellyn, he and Reagin entered into an option agreement pursuant to which Reagin was given the right to acquire 90% of the common stock of Glen Ellyn for an option fee of $1 million and a subsequent payment of $1.7 million. Under the terms of the agreement, Rosch also conveyed to Reagin the right to approve all Glen Ellyn loans in excess of $500,000. (FSLIC's Statement of Material Fact, ¶ 40.) Reagin paid Rosch the $1 million option fee by diverting Glen Ellyn loan proceeds, connected with a loan Reagin had recommended, back to Rosch. (FSLIC's Statement of Material Fact, ¶ 41.) It is unclear in the record thus far presented to the court who, if anyone, at Glen Ellyn was aware of the option agreement and payment arrangements between Rosch and Reagin. (Deposition of Thomas C. Kovac, pp. 34, 130 of Exhibit 8 to FSLIC's Statement of Material Fact ("secret approval" requirement of Rosch–Reagin option agreement limited Rosch's authority at Glen Ellyn).)

## B. *FSLIC Change in Control Requirements.*

Legislation enacted by Congress in 1978 requires that a person seeking to acquire control of any federally-insured savings and loan through, *inter alia,* a purchase of its voting stock must provide FSLIC with 60 days' prior written notification of the proposed acquisition. 12 U.S.C. § 1730(q)(1) (the "Change in Control Act"). The proposed acquiror is obligated to provide detailed information regarding the proposed acquisition and its effect on the insured institution. 12 U.S.C. § 1730(q)(6). Within the 60–day period, FSLIC may disapprove the proposed change in control or extend the period for disapproval in order to (a) secure additional information about the "competence, experience, integrity, and financial ability" of the proposed acquiror or (b) determine the accuracy and completeness of the information provided to FSLIC by the proposed acquiror. 12 U.S.C. § 1730(q)(2)(B).

On May 1, 1984, *i.e.* before he made a tender offer for 100% of the outstanding shares of Glen Ellyn, Rosch filed with FSLIC a notice of his intent to acquire an additional 9% of Glen Ellyn's stock, thereby increasing his percentage of the outstanding shares to 25.4%.[2] The FHLBB notified Rosch that it would require additional information before the application would be considered complete. (Exhibit 21 to FSLIC's Statement of Material Fact and ¶¶ 8–12 thereof.) Approximately two months later, Rosch purchased the remaining outstanding shares of Glen Ellyn. (FHLBB Memorandum dated February 4, 1985, Exhibit 20 to FSLIC's Statement of Material Fact, p. 7.) Rosch apparently never filed any notice of intent to acquire control with respect to the additional 74.6% of Glen Ellyn's shares that he purchased on July 3, 1984.[3]

When FSLIC discovered Rosch's attempt to acquire the remaining outstanding shares of Glen Ellyn, it sought injunctive relief in this court. A consent order was entered on September 7, 1984 requiring Rosch to, *inter alia,* place 76% of his stock in escrow and to reconstitute the board of directors with a majority of independent directors until the FSLIC had acted upon his notice of intent to acquire control. These directors were subject to the prior written approval of the FHLBB. (*Consent Order*, Exhibit 22 to FSLIC's Statement of Material Fact.) Despite the terms of the consent order, Rosch sold 90% of his stock on December 28, 1984 to four of Reagin's nominees. (FHLBB Report dated as of April 27, 1985, Exhibit 5 to FSLIC's Statement of Material Fact.)

## C. *Glen Ellyn Insolvency and FSLIC Receivership.*

In August of 1984 FSLIC began formal examination of Glen Ellyn's financial situa-

---

**2.** The requirements of 12 U.S.C. § 1730(q)(1) are triggered by the acquisition of 25% of more of any class of the voting securities of an insured institution. 12 U.S.C. § 1730(q)(9)(B).

**3.** The FHLBB eventually formally denied Rosch's application to acquire an additional 9% of the outstanding shares of Glen Ellyn on February 4, 1985.

tion. During the 33–month period prior to July of 1984 Glen Ellyn lost a total of $1.2 million. By late August or early September of 1985, the FSLIC's investigation had led it to conclude that Rosch, and possibly Reagin, were involved in a fraudulent scheme involving loan funds from Glen Ellyn. Eventually, a six-volume report was presented by FSLIC to its supervising authority, the FHLBB. Based upon this record, the FHLBB determined that Glen Ellyn (a) was insolvent; (b) had substantially dissipated its assets or earnings due to violation or violations of law or regulation; and (c) was in an unsafe and unsound condition to transact business. (Exhibit 1 to FSLIC's Statement of Material Fact.) The FHLBB appointed FSLIC as sole liquidating receiver on September 19, 1985. FSLIC, in its separate corporate capacity, subsequently purchased substantially all of the assets and assumed substantially all of the obligations of Glen Ellyn. (Exhibit 2 to FSLIC's Statement of Material Fact.) FSLIC assumed physical control over the operation of Glen Ellyn at the close of business on September 20, 1985.

### D. *The Savings and Loan Blanket Bond.*

On June 24, 1982, Transamerica issued a savings and loan blanket bond on Standard Form No. 22 (the "bond") to Glen Ellyn, insuring the institution against any loss incurred "directly from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others...." (Rider SR 6041, Exhibit 12 to FSLIC's Statement of Material Fact, p. 18.) Dishonest or fraudulent acts were defined in the bond as acts committed with the manifest intent to (a) cause loss and (b) obtain financial benefit for the employee. The bond insured against loss sustained by Glen Ellyn "at any time but discovered during the Bond Period...." (Exhibit 12 to FSLIC's Statement of Material Fact, p. 2.) Under the terms of the bond, discovery occurred "when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred even though the exact amount or details of the loss may not

be then known." (Rider SR 6091, Exhibit 12 to FSLIC's Statement of Material Fact, p. 12.)

Two termination provisions of the bond are the primary focus of these summary judgment motions. First, a rider to the bond provided for partial termination of coverage if the insured failed to notify Transamerica within 30 days of any change in control of Glen Ellyn due to a transfer of its outstanding voting stock or voting rights. "Control" was defined in the rider to mean:

> the power to determine the management or policy of the Insured by virtue of voting stock or voting rights ownership. A change in ownership of voting stock or voting rights which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten per cent (10%) or more of the outstanding voting stock or voting rights of the Insured shall be presumed to result in a change in control for the purpose of the required notice.

(Rider SR 6042, Exhibit 12 to FSLIC's Statement of Material Fact, p. 8.) Failure to provide the requisite notice would result in termination of coverage for any loss in which the transferee of the voting power was implicated, effective upon the date of the stock transfer. (*Id.*) Transamerica's first affirmative defense is based upon this change in control rider.

The other termination clause at issue is section 11(c) of the bond, which provided that that bond would be terminated as an entirety "immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials...." Transamerica's third affirmative defense is founded upon this term of the bond.

### E. *Transamerica's Cancellation of Coverage.*

The final anniversary date of the Transamerica bond was June 17, 1985. In order to determine whether it would renew the risk, Transamerica, through its local underwriter Robert Palmer, sought information regarding Glen Ellyn's financial condition. Palmer made inquiries of Glen Ellyn from

January through June of 1985. Glen Ellyn did not furnish the information. (FSLIC's Statement of Material Fact, ¶¶ 26–27 and accompanying exhibits.) In July of 1985 Palmer interviewed Glen Ellyn's comptroller. At that time Transamerica, through Palmer, learned that Glen Ellyn's financial condition was unstable. Palmer also discovered that Rosch had "bought out" the other directors and that the FHLBB was "all over" Rosch for his failure to comply with the notification requirements of the Change in Control Act. (Exhibit 15 to Palmer deposition, Exhibit 13 to FSLIC's Statement of Material Fact.) Palmer forwarded this information to Transamerica on July 22, 1985. Transamerica decided to terminate coverage under the bond and notified Glen Ellyn that coverage would be terminated effective September 28, 1985. Glen Ellyn was billed a premium, calculated on a full pro rata basis, for coverage from the anniversary date of the policy to and including September 28, 1985.

The court understands that this premium went unpaid for some time because on September 20, 1985 (*i.e.*, eight days before coverage was due to expire), the Transamerica agent responsible for Glen Ellyn's account asked Palmer to forward to Glen Ellyn a duplicate bill. Palmer took no action on this request for three days. At some point during that interval, Palmer became aware that the FSLIC had been appointed as receiver for Glen Ellyn. Palmer sent the duplicate bill on September 23, 1985 for coverage through September 28, 1985.

On the date it was appointed as Glen Ellyn's receiver, September 19, 1985, FSLIC notified Transamerica by certified mail that losses falling within the scope of coverage of the bond had been discovered by Glen Ellyn. (Defendant's Ex. 15 to Mirza deposition, Exhibit 15 to FSLIC's Statement of Material Fact.) Shortly thereafter, Palmer sent to Transamerica's home office a letter discussing, *inter alia,* potential defenses the insurer could raise to FSLIC's claim. In particular, Palmer noted that Transamerica might have "an ace in the hole on this termination question" due to Glen Ellyn's failure to formally notify Transamerica of Rosch's acquisition of 100% of the voting stock of Glen Ellyn in July of 1984. Palmer suggested:

> Without letting any one know that we are aware of this change of ownership, perhaps we would be able to disclaim any and all potential liability back to the change of ownership.

(Exhibit 24 to Palmer deposition, Exhibit 13 to FSLIC's Statement of Material Fact.) Palmer also noted that Glen Ellyn's insolvency "would tie into the bond form, Section 11, (C)." *Id.* Transamerica accepted the full pro rata premium on November 7, 1985.

FSLIC provided a detailed proof of loss to Transamerica on March 18, 1986. Approximately one year later Transamerica denied the claim.

On May 27, 1988, *i.e.* more than nine months after the complaint in this case had been filed, counsel for Transamerica sent a letter to the insurance agent responsible for handling Glenn Ellyn's account accompanied by a check in the amount of $78.78. The Transamerica check represented the "unearned premium received by Transamerica" for the 8–day period from September 20, 1985 through September 28, 1985. Transamerica, "through inadvertence" wrote counsel, had retained the premium after the "bond terminated by reason of the taking over of Glen Ellyn by the Federal receiver." (Exhibit 25 to FSLIC's Statement of Material Fact.)

Finally, the court understands that Transamerica's home office underwriting file was destroyed on February 1, 1988. Transamerica's informal document retention policy is to maintain home office financial institution files for two and a half years after termination of coverage, unless a claim has been made prior to that time. (Freeman deposition, Exhibit 1 to FSLIC's Statement of Genuine Issues.) The file was destroyed despite the fact that a claim had been made under the bond in 1985, proof of claim was filed in 1986, the FSLIC's complaint in this case had been filed in 1987, and production of the file was requested by FSLIC in December, 1987.

## DISCUSSION

### A. *Change in Control Rider: Transamerica's First Affirmative Defense.*

As explained above, a rider to the bond required Glen Ellyn to give written notice to Transamerica within 30 days of the insured's obtaining knowledge of a transfer of its outstanding voting stock or voting rights which would result in a change in control of the insured. Acquisition by a shareholder of 10% or more of Glen Ellyn's outstanding voting shares or voting rights triggered the notification requirement of the change in control rider. Transamerica's first affirmative defense is based on this "Notice of Change in Control" rider. The parties have filed cross-motions for summary judgment on the first affirmative defense.

In support of its motion, Transamerica argues the undisputed fact that Glen Ellyn failed to provide Transamerica with the required written notification within 30 days of either Rosch's acquisition of 100% of the stock of Glen Ellyn or Rosch's subsequent transfer of 90% of his stock to Reagin. Transamerica's Memorandum in Support of Motion for Summary Judgment, p. 10.

In its cross-motion, FSLIC argues that summary judgment on the first affirmative defense should be entered in its favor for two reasons: first, FSLIC maintains that the change in control rider is ambiguous and therefore should be construed against the insurer. As a matter of law, FSLIC argues, the rider should not be construed to require notice of a change in control that was accomplished without prior compliance with the requirements of 12 U.S.C. § 1730(q) and which was vigorously resisted by the FSLIC. Rather, the rider should be construed to require notification of a change in control only after "such time as the change in control is a legal reality complete with all applicable regulatory approvals." FSLIC's Brief in Opposition to Transamerica's Motion for Summary Judgment, p. 4. Alternatively, FSLIC argues that Transamerica waived its right to rely on the change in control rider. According to FSLIC, waiver occurred when (1) Transamerica had actual notice of Rosch's acqui-

sition of 100% of the voting shares yet agreed to continue coverage until September 28, 1985, (2) did not reduce the premium owed to reflect any reduction in coverage, and (3) accepted Glen Ellyn's premium for such coverage in November of 1985.

■ The court does not believe the change in control rider is ambiguous. Under Illinois law:

> if the words of [an insurance] policy can reasonably be given their plain, ordinary, and popular meaning, the provisions should be applied as written and the parties should be bound to the agreement they made.

*Western Casualty & Surety Co. v. Brochu,* 105 Ill.2d 486, 495, 86 Ill.Dec. 493, 497, 475 N.E.2d 872, 876 (1985). The court must therefore "look to the plain meaning of all contract provisions, endeavoring to 'give effect to the intent of the parties at the time they formed the contract.'" *United States Fire Ins. Co. v. Charter Financial Group,* 851 F.2d 957, 960 (7th Cir.1988), quoting *Keystone Square Shopping Ctr. Co. v. Marsh Supermarkets, Inc.,* 459 N.E.2d 420, 422 (Ind.App.1984). "[W]hen there is no real doubt about what the parties intended ... [the court] will not find the contract ambiguous." *Id.*

The court believes that the parties clearly intended that the change in control rider would be triggered by a de facto change in control, whether legally or illegally accomplished. The rider's obvious purpose was to ensure that Transamerica would be able to promptly assess whether the risk it had insured had altered due to a shift in the voting power of any individual. The value of the rider to the insurer would be significantly diminished if this court were to rule that the rider must be interpreted to mean that the insured had no obligation to notify the insurer of any change in control unless and until the statutory requirements of the Change in Control Act had been met.

FSLIC argues that the court should interpret the rider "consistently with the existing legislative and regulatory environment" rather than the regulatory environment that existed when the rider was draft-

ed in 1976. Prior to 1978, FSLIC did not have the power to disapprove individual sales or purchases of control of insured institutions.

The court believes that such an interpretation would be contrary to the intent of the parties to the bond. Glen Ellyn and Transamerica executed the insurance contract in 1982, *i.e.* after the regulatory power of FSLIC had been augmented by Congress. No effort was made by either party, however, to alter the terms of the rider to reflect the changes in FSLIC's authority. Moreover, the court believes that the parties' intent *not* to alter the rider to pertain to only "non-disapproved" changes in control can be evinced from the failure of the rider to define "control" in the same manner as the term is statutorily defined: the "control" notification requirement of the rider is triggered by the acquisition of 10% or more of the outstanding voting shares of stock, whereas the "control" notification requirement of 12 U.S.C. § 1730 is not triggered until a shareholder has acquired the power to vote 25% of any class of voting securities of an insured institution. 12 U.S.C. § 1730(q)(9)(B). Under FSLIC's interpretation of the rider, therefore, a shareholder's acquisition of 10 to 24.9% of the stock would require notification to the insurer within 30 days, whereas notification of the acquisition of 25% to 100% of the shares could be delayed for a significantly longer period.

In sum, the court rejects the argument that the change in control rider should be interpreted to require notification only after legal change in control has been effected by a shareholder. The court has concluded, however, that a genuine issue of material fact exists with regard to the issue of whether Transamerica waived its right to assert the rider to preclude coverage for liabilities incurred by Glen Ellyn as a result of Rosch's activities; therefore, Transamerica's motion for summary judgment on this issue must also be denied.

Under Illinois law, waiver consists of "the intentional relinquishment of a known right." *Western Casualty & Surety Co. v. Brochu,* 105 Ill.2d at 499, 86 Ill.Dec. 493, 475 N.E.2d 872. "A waiver may be express or implied, arising from acts, words, conduct, or knowledge of the insurer." *Id.*

The record in this case is unclear as to when Transamerica first became aware that Rosch had acquired 100% of the voting shares of Glen Ellyn. Palmer's letter dated July 22, 1985 to Transamerica's home office notes only that "The F.H.L.B. is all over President John Rosch who did not follow guidelines while buying out the other directors." At the latest, therefore, Transamerica was aware of Rosch's takeover of Glen Ellyn by the end of July of 1985. Despite this knowledge, Transamerica apparently never informed Glen Ellyn of its intent to rely on the change in control rider to deny coverage of any losses in which Rosch was implicated until March 5, 1987, approximately 21 months after it had acquired knowledge of the takeover.

In fact, there is some evidence to suggest that Transamerica viewed the change of control rider as its "ace in the hole" as early as October of 1985 and hoped, "[w]ithout letting any one know that we are aware of this change of ownership," to be able to disclaim "any and all potential liability back to the change of ownership." (Exhibit 24 to Palmer Deposition, Exhibit 13 to FSLIC's Statement of Material Fact.) Even so, Transamerica continued to accept full premiums from Glen Ellyn through November 7, 1985, *i.e.* the premium was not pro rated to reflect the reduction in Transamerica's risk by virtue of the fact that coverage of Glen Ellyn's principal officer supposedly had been terminated. The record is bereft of any facts regarding Transamerica's policy and practice with regard to reduction in premiums when a change in control rider operates to significantly reduce the risk the insurer has assumed. FSLIC has asserted, and Transamerica has not refuted, that Transamerica has never denied coverage of a claim by relying on a change in control rider.

In sum, the court believes that a genuine issue of material fact exists with regard to whether Transamerica waived its right to rely on the change in control rider to deny

coverage for losses sustained by Glen Ellyn as a result of Rosch's activities.

B. *Section 11(c) Takeover Clause: Transamerica's Third Affirmative Defense.*

Section 11(c) of the bond provided that the bond would be terminated "immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials." [4] Transamerica asserts as its third affirmative defense that since the bond terminated when FSLIC took over Glen Ellyn, there is no coverage for losses discovered at or after the date of the takeover. FSLIC's notice of loss on September 19, 1985, therefore, was ineffective since the bond had terminated that same day.

FSLIC has raised three grounds to support summary judgment in its favor on the third affirmative defense: (1) that section 11(c) is void and unenforceable because it conflicts with federal law and policy regarding FSLIC's obligations upon the insolvency of an institution insured by the federal agency; (2) that FSLIC's notice of loss was timely within the terms of the bond since notice was sent on September 19, 1985, the day prior to FSLIC's actual physical takeover of Glen Ellyn; and (3) that Transamerica waived its ability to rely on section 11(c). The court will consider each of these arguments in turn.

1. Unenforceability of section 11(c).

■ Relying principally upon *Federal Savings and Loan Insurance Corp v. Oldenburg*, 671 F.Supp. 720 (D.Utah 1987) and *FSLIC v. Mmahat*, No. 86–5160, LEXIS No. 1825 (E.D.La. March 3, 1988) [1988 WL 19304], FSLIC argues that section 11(c) of the bond is unenforceable since it is contrary to the statutory rights and duties conferred by Congress on FSLIC and the

FHLBB. *See also FSLIC v. Aetna Casualty and Surety Co.*, 701 F.Supp. 1357, 1362–63 (N.D.Tenn.1988). As explained at length in *Oldenburg, supra,* in the event of a default by a federally insured institution, FSLIC is statutorily authorized to take over the assets and operations of the institution and to take such further action that it deems to be in the best interest of the institution. *Oldenburg,* 671 F.Supp. at 722–24. FSLIC's powers to, *inter alia,* collect all obligations to the insured institution are "subject only to the regulation of the Federal Home Loan Bank Board." 12 U.S.C. § 1729 (1935). Section 11(c) of the bond, FSLIC argues, not only regulates but entirely precludes the agency's ability to collect the obligation Transamerica had incurred by reason of its issuance of the bond: it thereby violates 12 U.S.C. § 1729.

FSLIC's argument, while compelling, ignores one critical fact: "[t]he Federal Savings and Loan Insurance Corporation ('FSLIC') requires all member banks to purchase insurance coverage under Savings and Loan Blanket Bond Standard Form No. 22...." *Sharp v. Federal Savings and Loan Insurance Corp.*, 858 F.2d 1042, 1043 (5th Cir.1988) (hereinafter *"Sharp"*). The Transamerica bond was a Form 22 bond.

At issue in *Sharp* was whether coverage under a Form 22 bond terminated immediately upon the appointment by the FHLBB of a conservator for the insured institution or whether, under the terms of the bond at issue, no termination of coverage was effective until ten days after the Federal Home Loan Bank had received notice of such termination. The Fifth Circuit held that "the plain language of the bond unambiguously points to the conclusion that the bond terminated immediately upon the commencement of the conservatorship." 858 F.2d at 1046. The Fifth Circuit explained:

---

4. The court notes that, as originally drafted, the bond provided a state or federal receiver with the right to purchase, within 30 days of receivership, an additional twelve-month period in which to discover losses sustained by the insured institution. (Section 12: Rights after Termination or Cancellation, Exhibit 12 to FSLIC's Statement of Material Fact, p. 4.)

The original bond language was modified, however, in Rider SR 6091 to provide, in relevant part:
> The right to purchase such additional period for discovery of loss may not be exercised by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed to takeover the Insured's business....

*(Id.* at p. 13.)

We are aware that the conclusion we have reached may seem harsh to FSLIC, an institution beleaguered by thousands of thrift failures nationwide. The harshness of the rule is softened by two considerations. First, it is FSLIC itself that has chosen to require coverage under Form 22 as a condition of FSLIC membership. If it wishes an additional time period for discovering losses subsequent to establishment of a conservatorship, FSLIC need only alter its regulations. Second, FSLIC and the FHLB have plenary power to examine the books of member banks prior to the institution of conservatorships or takeovers. Here, for example, the losses reported on February 8 represented substantially the same losses that led the FHLB to appoint a conservator in the first instance. The sole effect of our decision is to require FSLIC and the FHLB to do their homework prior to the institution of a conservatorship.

In the face of the clear language of Form 22, we hesitate to rewrite judicially a standard form bond that has had a longer existence than FSLIC. If FSLIC finds the coverage provided by Form 22 inadequate, it need only require member banks to purchase an additional discovery period in the event of a type (c) termination.

*Id.* at 1047–48.

For the same reasons, FSLIC's arguments regarding the unenforceability of section 11(c) of Transamerica's bond must fail. Having required Glen Ellyn to procure a Form 22 bond, FSLIC simply cannot now be heard to complain about the enforceability of its provisions.

### 2. Takeover of Glen Ellyn.

■ Next, FSLIC argues that because it sent Transamerica a notice of loss on September 19, 1985 (the date FSLIC was appointed as Glen Ellyn's receiver) and did not take "physical possession of the institution" until the following day, notice occurred prior to any termination of the bond by virtue of section 11(c). FSLIC Mem. in Support of Motion for Summary Judgment, p. 23.

The court disagrees. As FSLIC itself notes, the " 'general American rule is that constructive possession and control of the receivership by the court properly dates from the making of the order appointing the receiver' "—in this case, September 19, 1985. FSLIC's Reply Brief in Support of Its Motion for Summary Judgment, p. 10, quoting Clark, *Law of Receivers* § 329 (3d ed. 1959). To rule otherwise would effectively enervate section 11(c) since the FSLIC could then, upon appointment as receiver, simply not enter the premises of the troubled financial institution until such time as it had investigated the causes of the losses and filed any notices required under any applicable insurance policies. The court cannot rewrite the bond to allow FSLIC this additional discovery period when, as noted above, it did not require its members banks to bargain for such a provision. Within the context of the bond, the "taking over" of Glen Ellyn occurred immediately upon the commencement of FSLIC receivership. *See Sharp, supra,* at 1046.

### 3. Waiver of section 11(c).

■ Finally, FSLIC argues that by its conduct, Transamerica has waived its right to rely on section 11(c) of the bond to preclude coverage. Under Illinois law, "[w]aiver, which may be expressed or implied, may be found where the words or conduct of an insurer are inconsistent with an intent to rely on the requirements of the policy." *Farmers & Merchants Bank v. Davis,* 151 Ill.App.3d 929, 936, 104 Ill.Dec. 850, 503 N.E.2d 565 (2d Dist.1987).

FSLIC contends that when (1) Palmer sent Glen Ellyn's agent a duplicate pro rata premium bill on September 23, 1985 with full knowledge of the FSLIC receivership; and (2) Transamerica accepted without reservation full pro rata payment on November 7, 1985 after being made aware by Palmer of a possible section 11(c) defense, Transamerica impliedly waived that defense.

Transamerica argues that its knowledge of the FSLIC receivership is irrelevant

since coverage under the bond terminated immediately upon the commencement of the receivership. The duplicate pro rata bill was sent, Transamerica notes, at the request of Glen Ellyn: the original bill had been sent on or about July 26, 1985 with the notice of cancellation, months before the FSLIC was appointed receiver. Transamerica was entitled to payment for coverage from June 17, 1985 to the date coverage was terminated by virtue of the FSLIC receivership, and accepted payment for that period of coverage on November 7, 1985. Transamerica was under no obligation to return the additional $78.78 (*i.e.*, the unearned premium for the eight days between the actual termination date and the scheduled termination date) since the bond provided that if coverage was terminated through the operation of section 11(c), the underwriter was obliged to return any unearned premium only if requested to do so. It is undisputed that FSLIC never requested a return of the unearned premium.

In considering a motion for summary judgment, the court must "indulge all reasonable inferences in favor of the person opposing the motion for summary judgment." *Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988). Such an indulgence requires this court, in considering Transamerica's motion for summary judgment with regard to its third affirmative defense, to infer that Transamerica's billing and acceptance of the entire pro rated premium—after being made aware of the possible significance of section 11(c)—was inconsistent with an intent to rely on that termination provision of the bond. Transamerica's motion must be denied. Similarly, in considering FSLIC's cross-motion, the

court must infer that Transamerica's billing and acceptance of the entire premium were simply an attempt to collect a past due bill, and that Transamerica did not return the unearned premium amount ($78.78) because the bond did not require it to do so unless requested. FSLIC's cross-motion must also be denied.[5]

### C. *John Rosch was the Alter Ego of Glen Ellyn: Transamerica's Seventh Affirmative Defense.*

■ Transamerica has moved for summary judgment on its seventh affirmative defense which states:

> Mr. Rosch had complete domination, direction and control over the insured and, therefore, the claim of the FSLIC is barred as a matter of law since the alleged losses which the insured sustained were the result of its own conduct.

Transamerica's "alter ego" defense has two prongs. First, the insurer argues, Rosch exercised such dominion and control over the affairs of Glen Ellyn that he must be determined to be the institution's "alter ego," thereby precluding recovery by the FSLIC for Glen Ellyn's own wrongdoing. Alternatively, Transamerica contends that Rosch so dominated and controlled Glen Ellyn's corporate affairs that he cannot be found to be an "employee" of Glen Ellyn, as that term is defined in the bond, and thus falls outside of the bond's coverage.

The court has concluded that as the record presently exists, there is a genuine issue of material fact with regard to whether there existed at Glen Ellyn any possibility of corporate control in any person other than Rosch and Reagin, and that summary judgment is therefore inappropriate. The

---

**5.** FSLIC contends that Transamerica's destruction of the home office file, standing alone, precludes summary judgment in favor of Transamerica on its section 11(c) defense. *See* FSLIC Mem. in Opposition to Transamerica's Motion for Summary Judgment, p. 8 ("Therefore, summary judgment in favor of Transamerica on its change in control defense, or on any of its other policy defenses subject to FSLIC's waiver argument (i.e., termination under Section 11(c) of the Bond) is certainly prevented by the document destruction issue.") Without deciding the issue, the court notes that FSLIC has not

established the relevance of the home office file to the section 11(c) defense, a critical threshold showing. *See, e.g., Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217 (1st Cir.1982) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction. . . .") FSLIC has nowhere explained how the contents of the home office file bear on its argument that Transamerica's conduct implied a waiver of an intent to rely on section 11(c).

record is especially lacking on the issue of the relationship between Rosch, Reagin and the other directors at Glen Ellyn. Although in July of 1984 Rosch chose and elected seven of Glen Ellyn's directors (including himself), a jury reasonably "could infer either that all were co-conspirators or that they were honest men despite their connections with rogues." *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 427 F.2d 862, 869 (4th Cir. 1970). Two months later, moreover, four of the seven members of the board were subject to prior approval by the FHLBB. Similarly, Rosch's control over the stock he had purchased is at issue: the shares were placed into an escrow upon the order of Judge Kocoras of this court in September of 1984 and Rosch was ordered not to "vote or control" more than 25% of the stock of Glen Ellyn.

As noted earlier, in considering a motion for summary judgment the court must draw all reasonable inferences in favor of the non-moving party, here FSLIC. In so doing, the court has concluded that summary judgment on Transamerica's seventh affirmative defense must be denied.

D. *Glen Ellyn's Failure to Disclose the Existence of the 1976 Cease and Desist Order: Transamerica's Fifth Affirmative Defense.*

■ As its fifth affirmative defense, Transamerica states:

At the time the insured applied for the bond at issue, it failed to disclose to Transamerica facts which were material to the risk, therefor rendering the bond *void ad initio.*

In particular, Transamerica argues, Glen Ellyn's failure to notify the insurer of the existence of the 1976 cease and desist order justifies recission of the bond. Illinois law, according to Transamerica, "does place an affirmative duty on an applicant to disclose information which might be relevant to the risk." (Transamerica's Reply Mem., p. 20.)

Transamerica is mistaken. Although Illinois law requires that an insurance applicant be truthful in its response to an application's inquiry, Illinois courts have de-

clined to impose a duty on the insured to volunteer to the insurer information material to the risk involved. *Preferred Risk Mutual Insurance Co. v. Hites,* 125 Ill. App.2d 144, 259 N.E.2d 815 (3rd Dist.1970). *See also National Union Fire Ins. Co. of Pittsburgh v. Continental Illinois Corp.,* 658 F.Supp. 781, 792 (N.D.Ill.1987). Rather, Illinois imposes "the obligation and duty upon the insurance company to determine and advise the applicant or the insured, as the case may be, what information the insurance company must have before it will consider whether or not to insure the risk." *Id.* 125 Ill.App.2d at 153, 259 N.E.2d 815.

It is undisputed in this case that Transamerica failed to inquire of Glen Ellyn during the application process in 1982 whether the institution was operating pursuant to a cease and desist order. (FSLIC's Statement of Material Fact, ¶ 18.) Moreover, Mr. Freeman of Transamerica has testified at his deposition that the existence of the cease and desist order would not necessarily have precluded Transamerica from insuring Glen Ellyn under the bond. *Id.* and Exhibit 1 thereto.

In sum, summary judgment on Transamerica's fifth affirmative defense must be denied.

## CONCLUSION

For the reasons set forth herein, Transamerica's motion for summary judgment on its eighth affirmative defense, which pertains to certain trading losses suffered by Glen Ellyn and which is uncontested by FSLIC, is GRANTED. In all other respects, the parties' cross-motions for summary judgment are DENIED. The parties are strongly urged to discuss settlement and to report on status on February 8, 1989 at 10:00 a.m.